**Billie BAILEY, Defendant Below, Appellant,**

v.

**STATE of Delaware, Plaintiff Below, Appellee.**

Supreme Court of Delaware.

Submitted: July 14, 1982.

Decided: Feb. 7, 1983.

Opinion on Death Sentences: May 7, 1984.

Decided: Sept. 20, 1984.

Howard F. Hillis and Gregg E. Wilson (Argued), Asst. Public Defenders, Nancy Jane Mullen (Argued), Asst. Public Defender, Wilmington, for defendant below, appellant.

John A. Parkins, Jr. (Argued), Deputy Atty. Gen., Wilmington, and Gary A. Myers (Argued), Deputy Atty. Gen., Georgetown, for plaintiff below, appellee.

Before HERRMANN, C.J., and McNEILLY, QUILLEN, HORSEY and MOORE, JJ., constituting the Court en Banc.

McNEILLY, Justice:

Defendant, Billie Bailey, appeals his Superior Court jury convictions of Robbery in the First Degree, Possession of a Deadly Weapon by a Person Prohibited, two charges of Possession of a Deadly Weapon During the Commission of a Felony, and two charges of Murder in the First Degree. Defendant also appeals the jury finding beyond a reasonable doubt of statutory aggravating circumstances and unanimous binding recommendation upon the Court that a sentence of death be imposed on each charge of Murder in the First Degree.[1]

For reasons hereinafter stated we only consider at this time the asserted grounds for reversal applicable to the guilt phase of trial, reserving jurisdiction on the issues raised with respect to the mandated death penalty.

## I

At approximately 3:30 P.M. on Monday, May 21, 1979, the defendant, Billie Bailey, appeared at the home of Sue Ann Coker, his foster sister, in Cheswold, Delaware. Apparently defendant's initial conversation concerned his refusal to return to the State work release correctional detention facility known as the Plummer House where he was being detained. Defendant had a bottle of Vodka with him although he did not

---

1. For copies of the indictments and pertinent statutory provisions see Appendix "A". Not included in Appendix A. are those provisions relating to the death penalty procedure which given our holding it is unnecessary to set out these provisions.

appear to his foster sister to have had anything to drink. A few minutes later Charles Coker, Sue Ann's husband, and defendant left to pick up Sue Ann's son at school. On the way defendant asked Charles to stop at a package store so he could get another bottle. Bailey entered the liquor store and robbed Reba S. Lovegrove, the clerk at gun point. Bailey came out of the liquor store with a bottle in one hand and a 25 caliber pistol in the other. He told Charles Coker that the police would soon be arriving and to drop him off at Lambertson's corner, approximately one mile and a half away. Mr. Coker complied, then returned to the scene of the robbery to inquire about the welfare of Mrs. Lovegrove. On arrival he met Mrs. Lovegrove and Robert Kimbles, the owner of the liquor store. By telephone Mr. Coker advised the State Police that the robbery perpetrator was Billie Bailey. In the meantime Bailey had entered the farmhouse of the 80 year old retired farmer, Gilbert Lambertson, and his 73 year old wife Clara, and had murdered both of them without any known provocation or prior disposition. Both died of multiple gunshot wounds from the 25 caliber pistol used by Bailey in the robbery at the liquor store and from a single barrel .12 gauge shotgun belonging to Mr. Lambertson.

Mary Ann Lambertson, daughter-in-law of the victims, was picking strawberries when she heard the police cars and police helicopter approaching. She next heard shots and saw a man running from the area of the Lambertson chicken houses toward the woods. The man was white, short and stocky, dressed in dark clothes and carrying a shotgun. Very quickly the police converged upon the scene in pursuit of Bailey then known only as the prime robbery suspect. Bailey was apprehended by the co-pilot of the police helicopter after Bailey had attempted to shoot him with the 25 caliber handgun as the trooper stood on the shotgun which Bailey had dropped. After being handcuffed Bailey, in response to no questioning, is reported to have said "You boys got me for the store and nothing else."

In due course, and without any arguable delay, Bailey was taken before a Justice of the Peace where he was formally charged with the offenses involved, advised of his rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and informed of the nature of the charges against him and the possible penalties. The presiding Justice of the Peace testified at trial that during Bailey's appearance before him the following colloquoy transpired:

A. "During most of the proceeding he was shouting and yelling profanities. The most remarkable was the statement I suppose he said at the end of the proceeding. I believe he first made a remark about, "You're going to put me in jail anyway. I know there is no bail for this." I believe it was just about the time, right after the time I was reading the statute as far as penalty for the charge was concerned. He then made a statement, "Why don't you go ahead and kill me," or, "Why don't you go ahead and hang me." As I recall, he following that with either, "You know I did it," or, "You know I killed them." I'm not sure exactly what his exact words were at this point."

Q. "You had already read the warrant to him and that he had been charged and arrested for murder of Gilbert and Clara Lambertson; is that correct?"

A. "Yes, sir. That's correct."

Q. "Then he made that statement?"

A. "Yes, sir. That was after that."

Robert Collison, the Delaware State Police detective in charge of the investigation, was more specific. Detective Collison testified during the arraignment conducted by the Justice of the Peace and the penalties for first degree murder were being explained, Bailey said: "Go ahead and hang me you son-of-a-bitch. I killed them. Go ahead and kill me", and further, "I'm going to make them kill me tomorrow". Detective Collison testified that those statements

were written verbatim by him and memoralized in the notes which he made at the time.

## TRIAL

## II

Defendant's first two grounds for reversal are based upon the Trial Court's denial of his Motion for Change of Venue because of alleged prejudicial pre-trial publicity and reversible error in the selection and empanelling of the trial jury. The two grounds asserted are so closely related on their merits factually that they need not be considered separately, for if a fair and impartial jury was empanelled the first two allegations of error must fail. The Motion for Change of Venue which was filed prior to the date scheduled for trial cited fourteen articles, eight photographs and two editorials appearing in the Delaware State News, a daily newspaper circulated primarily throughout the area of Kent County. The Superior Court Judge assigned to the trial of this case took the Motion under advisement. Following a hearing the Trial Judge preliminarily denied the Motion stating that he was not convinced the publicity was so extensive and so inflammatory and prejudicial as to preclude the selection of a fair and impartial trial jury. The Trial Judge reserved final decision, however, until the jury selection process was undertaken and concluded.

The right to an impartial jury is guaranteed in criminal proceedings by the Sixth and Fourteenth Amendments to the United States Constitution. Under Rule 18 of the Superior Court Criminal rules:

"Except as otherwise permitted by statute or by these rules, the prosecution shall be in the County in which the offense was committed."

But under Superior Court Criminal Rule 21(a):

"The Court upon motion of the defendant shall transfer the proceeding to another county if the Court is satisfied that there exists in the County where the prosecution is pending so great a prejudice against the defendant that he cannot obtain a fair and impartial trial in that County."

■ The Trial Judge in this case was not so satisfied and deferred final judgment on that point until his preliminary opinion was either buttressed by the selection and empanelling of an impartial jury or reversed by the inability to do so with reason and dispatch. We cannot say that was an abuse of discretion. *Parson v. State*, Del. Supr., 222 A.2d 326, 335 (1966), *cert. denied* 386 U.S. 935, 87 S.Ct. 961, 17 L.Ed.2d 807 (1967).

We note in passing that the publicity supporting defendant's Motion for Change of Venue appeared within three weeks after the murders, a full eight months before trial and were not the type which could be labeled as a "convict-or-else" type found elsewhere. *United States v. Mesarosh*, 3rd Cir., 223 F.2d 449 (1955), *reversed on other grounds*, 352 U.S. 1, 77 S.Ct. 1, 1 L.Ed.2d 1 (1956). Instead the articles were indisputably factual in nature, but prejudicial and inflammatory only to the extent arising from the normal and natural reaction to any purely factual news item about a very serious crime. The articles, however, also were framed in great part as a political condemnation and reaction to the criminal work release program to which defendant was assigned at the time of the murders.

With that background in mind instead of presumptively calling the Trial Judge's action on the Motion an abuse of discretion we are satisfied that his decision to await voir dire examination of the prospective jurors before reaching final judgment on the Motion was well within the exercise of his discretionary powers.

The defendant claims the Trial Judge had a closed mind at the time of making his preliminary ruling on the Motion as evidenced by his statement "We will get a jury", and by his failure to question prospective jurors regarding their exposure to

the extensive pretrial publicity complained of.

We must, therefore, review the selection process. In preparation for jury selection defense counsel submitted a series of questions to the Court for preliminary submission to the entire panel prior to the drawing of individual prospective jurors.[2] Procedurally in the trial of a case of Murder in the First Degree involving the possibility of a death penalty, prospective jurors are called and individually interrogated on *voir dire* prior to being seated or rejected. The Trial Judge rejected defense counsel's requested interrogatories and conducted the preliminary questioning of the entire array as follows:

"THE PROTHONOTARY: Ladies and gentlemen, we are about to select a jury in the case of State of Delaware against Billie Bailey. This is a criminal case and the charges against the defendant are possession of a deadly weapon by a convicted felon, robhery in the first degree, two charges of murder in the first degree and two charges of possession of a deadly weapon during the commission of a felony. We estimate that this trial will take two weeks.

Do you know anything about this case either through personal knowledge, discussion with anyone else or the news media? Do you know the defendant or his friends or relatives?

The State is represented by James C. Liguori, a Deputy Attorney General and the defendant is represented by Nan Mullen and Howard Hillis. Do you know the attorneys in this case or any other attorneys employed in the office of the Attorney General or defense counsel?

Do you know any of the following persons who might be called to testify as witnesses: Sergeant Robert Collison, Detective Mark Bundek, Pfc. Harry O'Neal, Corporal Thomas W. Robbins, Detective David Coxe, Corporal William Cassell, Sergeant Bruce Pearce, Corporal F.T. Schnible, Corporal Merle Shaner, James Edge, Ernest Faulkner, Mary Shields, Reba Lovegrove, Charles Coker, Sue Ann Coker, Robert Kimbles, Mary Ann Lambertson, Dr. Robert Buckley, Judge Charles Stump, David Grimes, John Kilty, Robert Beams, Dr. Judith Tobin, Saxton Lambertson, Walter Dean Bales, Jr. Evan Hodge, Mrs. Beasley, Jim Sudler, Dr. Irwin Weintraub, Dr. George Voegel.

Do you have any bias for or against the defendant?

THE COURT: I have two or three questions to ask.

Number one, are you related to or a close friend of anyone who has been or is now employed by a police agency? Are you related to or a close friend of anyone who has been or now is employed in the Attorney General's office or are you related to or a close friend of the alleged victims in this case or any members of their family?

THE PROTHONOTARY: If your answer to any of these questions is yes, please come forward.

THE COURT: Those of you responding give your name to the clerk. Do not hold a conversation with her. Giver her your name.

(Four members of the jury panel came forward.)

THE COURT: Ladies and gentlemen, those of you who have just responded to the questions that were asked either by the clerk or by me will be excused until 10:00 o'clock tomorrow morning. The remainder of the jurors, please stay in the courtroom. You will be called one by one in another courtroom where you will be asked further questions."

 In spite of defendant's contention that the Court erred in not questioning the entire panel of prospective jurors as requested, we are satisfied that the substantive areas designed to ferret out prejudice were sufficiently and properly explored with the panel prior to the more detailed questioning of the individuals as called,

---

**2.** The questions submitted by defense counsel are attached hereto as Appendix "B".

required by Superior Court Criminal Rule 24(aa). The ineffective exploration of exposure to pretrial publicity argument has no merit. At the very outset of jury selection the entire array was asked if anyone knew anything about this case either through personal knowledge, discussion with anyone else or the news media. Four prospective jurors responded and were excused. To continue asking the same thing over and over again on an individual basis as each individual prospective juror was called, would serve no useful purpose. *Voir dire* has as its purpose aid to the Trial Judge in ferreting out of unqualified jurors unable to render a fair and impartial verdict based solely on the law and evidence adduced at trial regardless of any opinion of the case previously formed or expressed. See *Whalen v. State*, Del.Supr., 434 A.2d 1346 (1981), 11 *Del.C.* § 3301.[3] The seating of the jury after individual questioning required by § 3301 in capital cases assured the desired result in this case.

Jury selection then continued on an individual basis. When it came time to recess for the day eleven jurors had been seated. The defense had exercised sixteen peremptory challenges leaving four peremptory challenges available during the seating of the twelfth juror. Alternate jurors are challenged under a separate section of Rule 24. The next day the twelfth juror was seated after the defense had exhausted peremptory challenges and the Trial Judge had refused to excuse for cause number twelve juror.

The seating of juror number twelve precipitated defendant's contention that juror number twelve was an unqualified juror,

and the Court's refusal to excuse him for cause tainted the jury selection in violation of defendant's Sixth Amendment right to trial by an impartial jury. Defendant further contends that this error is compounded by the Trial Judge's failure to effectively explore an alleged hearing defect of a prospective juror and by the Trial Judge's refusal to question individually each prospective juror regarding exposure to pretrial publicity.

The basic thrust of defendant's attack on the jury selection is his contention that the Trial Judge's failure to excuse six presumptively biased prospective jurors for cause, required defendant to exhaust his peremptory challenges prematurely, resulting in the forced improper seating of juror number twelve. Juror number twelve was a brother to two Massachusetts police officers and former supervisor at the General Foods plant of a witness who had been at the murder scene after the fact. The defendant claims these facts required the Court to excuse for cause.

In reviewing the refusal of the Trial Judge to excuse juror number twelve we must examine the *voir dire* questioning of that juror

"KENNETH BRENTON, having been first duly sworn, was examined and testified as follows:

THE COURT: Yesterday you responded to one of the questions asked by either the clerk or by me. Would you tell me what that was?

MR. BRENTON: I have two brothers that are on the police force in Massachusetts.

THE COURT: In Massachusetts?

3. 11 *Del.C.* § 3301 provides as follows:

"When a juror is called in a capital case, he shall be first sworn or affirmed upon the voir dire and then asked, under the direction of the court, if he has formed or expressed any opinion in regard to the guilt or innocence of the prisoner at the bar. If his answer is in the negative, he shall be sworn as a juror in the case, unless he has conscientious scruples against finding a verdict of guilty in a case where the punishment is death, even if the evidence should so warrant him, or unless he

shall be peremptorily challenged, challenged for cause or excused by consent of counsel on both sides. If his answer to the question be in the affirmative, he shall be disqualified to sit in the case, unless he shall say, upon his oath or affirmation, to the satisfaction of the court, that he feels able, notwithstanding such an opinion, to render an impartial verdict upon the law and the evidence, in which event he shall be a competent juror, if not otherwise disqualified, challenged or excused."

MR. BRENTON: Yes. And I also know James Edge. I worked with him three years ago.

THE COURT: Who is he?

MR. LIGUORI: Mr. Edge is an occurrence witness.

THE COURT: Testimony that is not in issue?

MR. LIGUORI: I don't believe it is.

MS. MULLEN: I can't represent that it's not.

MR. LIGUORI: I don't believe it is. He was at the scene afterwards.

THE COURT: How well do you know him? You worked with him.

MR. BRENTON: Well, he worked under my supervision for several years, sir. About three years ago.

THE COURT: Under your supervision. Where?

MR. BRENTON: At General Foods.

THE COURT: Did you become a personal friend of his?

MR. BRENTON: No, sir.

THE COURT: Clearly employer-employee?

MR. BRENTON: Yes.

THE COURT: Would your knowledge of him during those years have any bearing on your ability of being an impartial juror in a case that he testifies in?

MR. BRENTON: No, sir.

THE COURT: Strictly an employer-employee relationship?

MR. BRENTON: Yes, sir. Never got beyond that.

THE COURT: You say you have two brothers on the Massachusetts State Police Department.

MR. BRENTON: Yes. In Foxboro, Massachusetts and one in Boston, Massachusetts.

THE COURT: Would that have any bearing on your ability to be an impartial juror where a Delaware State Police officer were to testify?

MR. BRENTON: No, sir.

THE COURT: You would not be inclined to give a State Policeman more credence than anyone else?

MR. BRENTON: No, sir.

THE COURT: Let me ask you two further questions. If the evidence justified it, could you return a verdict in a case knowing that the death penalty could be imposed?

MR. BRENTON: Yes, sir.

THE COURT: Have you formed or expressed an opinion concerning the guilt or the innocence of the defendant in this case?

MR. BRENTON: No, sir.

THE COURT: You need not inquire of the defendant.

THE PROTHONOTARY: Does the State challenge or accept?

MR. LIGUORI: Swear the juror.

(The juror was sworn.)

THE COURT: The bailiff will escort you to the jury room, Juror number twelve."

■ Clearly no abuse of discretion is apparent in the refusal to excuse juror number twelve for cause. See *United States v. Caldwell*, D.C.Cir., 543 F.2d 1333 (1974), cert. denied, 423 U.S. 1087, 96 S.Ct. 877, 47 L.Ed.2d 97 (1976).

■ As to the other five supposedly presumptively biased prospective jurors, who were not excused by the Court for cause as requested by defendant, one was the wife of the Warden of Kent Correctional Institution, one was a friend of someone employed in the Department of Corrections, one was related by marriage to the nephew of a State policeman, one was a brother of the wife of a local town police chief, and the fifth was an acquaintance of a State policeman. The warden's wife in response to the Court's questioning stated that: (1) she had neither formed nor expressed an opinion as to the guilt or innocence of defendant; (2) she could return a verdict if the evidence justified it in a case involving the death penalty; (3) she knew of no reason why she could not remain

totally impartial and open-minded; (4) she knew nothing about the circumstances of the case; and (5) she did not discuss her husband's work in the correctional facility with him. The lady who is a friend of someone in the Department of Corrections testified that she had formed no opinion, knew nothing of the case, and was completely impartial. The lady who is related by marriage to a nephew of a State policeman testified that she did not know the nephew and had formed no opinion in the case. The gentleman who is a brother to the wife of the Clayton police chief testified that this relationship would have no affect upon his impartiality. The lady who knows the State policeman who was not to be a witness also testified that her acquaintance with the policeman would not affect her impartiality as a juror. Of the six, defendant requested only two, not including number twelve, be excused for cause. He challenged five, but could not challenge number twelve peremptorily because the challenges had been exhausted. Given the proper exercise of discretion as to juror number twelve, there can be no reversible error, and we find no error at all in any ruling by the Trial Judge on challenges. We also find in light of the jury selection process that discretion was properly exercised in refusing a change of venue.

### III

The next reason advanced for reversal concerns the defendant's competency to stand trial. Defense counsel contends that the defendant was incompetent.

On the morning of trial, defense counsel requested a hearing before the Court on the issue of defendant's competency to stand trial, asserting that because of his emotional instability he was unable to consult with and assist his counsel rationally and to understand the proceedings against him. The next morning jury drawing was suspended and a competency hearing was held at which the defense presented Dr. Weintraub, a recognized expert in the field of psychology, and Sue Ann Coker, foster sister of defendant. The State presented Dr. Robert Buckley, Medical Director of Delaware State Hospital.

In essence Dr. Weintraub testified that as a result of his minimal testing of defendant he was of the opinion that defendant was incapable of assisting his attorneys in preparing his defense due to his expressed, strong desire to be found guilty and to die. Dr. Weintraub concluded that defendant was severely handicapped in working with people because of his distrust of everyone involved on all sides and belief that a plot existed against him, and that, as a result, he was incompetent in the sense of being unable to assist counsel. On the other hand, Dr. Weintraub stated that defendant was able to converse coherently and relevantly on various topics, and on cross-examination testified that Bailey could intellectually communicate.

Mrs. Coker added little but indicated no lack of, nor problem of communication with defendant. To the contrary the main thrust of Coker's testimony was to assert and reassert that what defendant really wanted was a fair trial, that he did not think his lawyers were doing what they should be doing, and an implication that perhaps defendant did not remember the murders.

Dr. Buckley on the other hand testified and opined in summary:

"It was my opinion that he did not have a definable mental illness or defect. That he is aware of the charges against him and the possible penalties. That he was intellectually and emotionally able to cooperate with his own defense and what he regarded as his own best interest."

At the conclusion of the competency hearing the Trial Judge stated on the record:

"There is (sic) obviously conflicts between experts that have testified today. In resolving the conflict, I find no mental illness or mental defect and I find the defendant legally competent to stand trial."

■ The test of whether or not Bailey was competent to stand trial is whether he had sufficient present ability to consult with his attorneys rationally and has a rational as well as factual understanding of the proceedings against him. *See Williams v. State*, Del.Supr., 378 A.2d 117 (1977), cert. denied 436 U.S. 908, 98 S.Ct. 2241, 56 L.Ed.2d 406 (1978). The finding of the Trial Judge that Bailey was competent to stand trial is supported by the evidence in the record and is entitled to deference by this Court.

## IV

Defendant's next ground for reversal concerns the Trial Judge's refusal to hold a hearing on the voluntariness of the inculpatory spontaneous statements made by defendant at the time of his arrest and at the time of his preliminary Justice of the Peace Court arraignment. Defendant contends that the Trial Judge's refusal to hold this voluntariness hearing violates his due process rights under *Jackson v. Denno*, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1974) and is reversible error.

■ Had there been an assertion that the defendant's statements occurred during police interrogation or were the product of any coercive tactics or methods used by the police, then a voluntariness hearing would have been required under *Jackson v. Denno* and *State v. Rooks*, Del.Supr., 401 A.2d 943, 949 (1979). However, where the statements complained of were spontaneous and without coercion, a *Jackson v. Denno* hearing is not necessary because the interests a *Jackson v. Denno* hearing seeks to protect are simply not present. *See Jackson v. Denno*, 378 U.S. at 401–410, 84 S.Ct. at 1793–1798 (Black, J.) dissenting in part and concurring in part); *United States v. Bernett*, D.C.Cir., 495 F.2d 943, 965–72 (1974); *United States v. Konigsberg*, 3rd Cir., 336 F.2d 844, 853 (1964) *cert. denied*, 379 U.S. 933, 85 S.Ct. 334, 13 L.Ed.2d 344 (1964).

## V

■ The only other issue of any merit raised by defendant concerning the guilt phase of this case is the alleged abuse of discretion on the part of the Trial Judge in admitting into evidence, over objection, certain photographs whose probative value defendant claims is outweighed by the prejudicial impact on the jury. Defendant claims the photographs which show victims and the window shades and the walls of the home with human flesh on them were inflammatory, prejudicial and cumulative. The State, on the other hand, argues that the photographs had substantial probative value in rebutting the defense contention that during the murder defendant was in a wild "frenzy" when, in fact, the pictures show the closeness of the victims to each other at the time they were shot as well as the closeness of the defendant to the victims at the time the critical wounds were inflicted. The Trial Judge has broad discretion in admitting or rejecting photographic evidence of the victims and scenes of murders. We find no abuse of that discretion in this case. *Casalvera v. State*, Del.Supr., 410 A.2d 1369 (1980).

\* \* \*

For the reasons stated the convictions and sentences are affirmed, with the exception of the mandatory death sentence imposed by the jury following the bifurcated penalty hearing.

Issues raised in this appeal pertaining to the death penalty are presently pending for final disposition by the Supreme Court of the United States. See *Zant v. Stephens*, 456 U.S. 410, 102 S.Ct. 1856, 72 L.Ed.2d 222 (1982); *Barclay v. Florida*, 459 U.S. 987, 103 S.Ct. 340, 74 L.Ed.2d 382 (1982). The majority of the Court, therefore, deems it advisable to withhold decision on the death penalty phase of this appeal until the United States Supreme Court has spoken. Jurisdiction is reserved as to death sentence. No mandate on any aspect of this appeal will issue until further order of the Court.[4]

4. McNeilly, J. respectfully dissents as to withholding decision on the sentence of death.

APPENDIX A

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE
IN AND FOR KENT COUNTY

| | |
|---|---|
| THE STATE OF DELAWARE<br>vs.<br>BILLIE BAILEY | INDICTMENT BY THE<br>GRAND JURY |

The Grand Jury charges BILLIE BAILEY with the following offenses:

### COUNT I IK–79–05–0085

POSSESSION OF A DEADLY WEAPON BY A CONVICTED FELON, a felony, in violation of Title 11, Section 1448 of the Delaware Criminal Code.

BILLIE BAILEY on the 21st day of May, 1979, in the County of Kent did at the Cheswold Beverage Mart, located on County Route #156, approximately 1.7 mile north of Dover, Delaware, have in his possession a handgun, a deadly weapon, having been sentenced on Cr.A. No. 59, 1974, Theft (Felony), on February 14, 1975 in the Superior Court of the State of Delaware, In and For Kent County.

### COUNT II IK–79–05–0086

ROBBERY IN THE FIRST DEGREE, a felony, in violation of Title 11, Section 832(a)(2) of the Delaware Criminal Code.

BILLIE BAILEY on the 21st day of May, 1979, in the County of Kent, did in the course of committing theft, unlawfully use and threaten the immediate use of force upon Reba S. Lovegrove, a clerk at the Cheswold Beverage Mart, located on County Route #156, approximately 1.7 mile north of Dover, Delaware, while displaying what appeared to be a deadly weapon, a handgun, to compel her to deliver up money in her custody.

### COUNT III IK–79–05–0087

MURDER IN THE FIRST DEGREE, a felony, in violation of Title 11, Section 636(a)(1) of the Delaware Criminal Code.

BILLIE BAILEY on the 21st day of May, 1979, in the County of Kent, did intentionally cause the death of Clara Lambertson on County Route #156, approximately .6 mile north of Dover, Delaware.

### COUNT IV IK–79–05–0088

MURDER IN THE FIRST DEGREE, a felony, in violation of Title 11, Section 636(a)(1) of the Delaware Criminal Code.

BILLIE BAILEY on the 21st day of May, 1979, in the County of Kent, did intentionally cause the death of Gilbert Saxton Lambertson on County Route #156, approximately .6 mile north of Dover, Delaware.

### COUNT V IK–79–07–0202

POSSESSION OF DEADLY WEAPONS DURING THE COMMISSION OF A FELONY, a felony, in violation of Title 11, Section 1447(a) of the Delaware Criminal Code.

BILLIE BAILEY on the 21st day of May, 1979, in the County of Kent, did unlawfully have in his possession at County Route #156, approximately .6 mile north of Dover, Delaware, a .22 caliber pistol and a 12 gauge shotgun, deadly weapons, during the commission of the murder in the first degree of Clara Lambertson, a felony.

COUNT VI IK–79–07–0203

POSSESSION OF DEADLY WEAPONS DURING THE COMMISSION OF A FELONY, a felony, in violation of Title 11, Section 1447(a) of the Delaware Criminal Code.

BILLIE BAILEY on the 21st day of May, 1979, in the County of Kent, did unlawfully have in his possession at County Route #156, approximately .6 mile north of Dover, Delaware, a .22 caliber pistol and a 12 gauge shotgun, deadly weapons, during the commission of the murder in the first degree of Gilbert Saxton Lambertson, a felony.

A TRUE BILL

_____
(Foreman)

_____
(Secretary)

_____
ATTORNEY GENERAL

_____
DEPUTY ATTORNEY GENERAL

11 Del.C. § 636 reads as follows:

## § 636. Murder in the first degree; class A felony.

(a) A person is guilty of murder in the first degree when:

(1) He intentionally causes the death of another person;

(2) In the course of and in furtherance of the commission or attempted commission of a felony or immediate flight therefrom, he recklessly causes the death of another person;

(3) He intentionally causes another person to commit suicide by force or duress;

(4) He recklessly causes the death of a law-enforcement officer, corrections employee or fireman while such officer is in the lawful performance of his duties;

(5) He causes the death of another person by the use of or detonation of any bomb or similar destructive device;

(6) He, with criminal negligence, causes the death of another person in the course of and in furtherance of the commission or attempted commission of rape, kidnapping, arson in the first degree, robbery in the first degree, or immediate flight therefrom;

(7) He causes the death of another person in order to avoid or prevent the lawful arrest of any person, or in the course of and in furtherance of the commission or attempted commission of escape in the second degree or escape after conviction.

11 Del.C. § 1447 reads as follows:

## § 1447. Possession of a deadly weapon during commission of a felony; class B felony.

(a) A person who is in possession of a deadly weapon during the commission of

a felony is guilty of possession of a deadly weapon during commission of a felony.

Possession of a deadly weapon during commission of a felony is a class B felony.

(b) Notwithstanding § 4205 of this title, the minimum sentence for a violation of this section shall be not less than 5 years which minimum sentence shall not be subject to suspension and no person convicted for a violation of this section shall be eligible for parole or probation during such 5 years.

(c) Any sentence imposed upon conviction for possession of a deadly weapon during the commission of a felony shall not run concurrently with any other sentence. In any instance where a person is convicted of a felony, together with a conviction for the possession of a deadly weapon during the commission of such felony, such person shall serve the sentence for the felony itself before beginning the sentence imposed for possession of a deadly weapon during such felony.

(d) Every person charged under this section over the age of 16 years shall be tried as an adult, notwithstanding any contrary provision of statutes governing the Family Court or any other state law.

(e) A person may be found guilty of violating this section notwithstanding that the felony for which he is convicted and during which he possessed the deadly weapon is a lesser included felony of the one originally charged. (11 Del.C. 1953, § 1447; 58 Del.Laws, c. 497, § 1; 59 Del.Laws, c. 203, § 34; 59 Del.Laws, c. 547, § 15; 60 Del.Laws, c. 306, §§ 1, 2.)

11 Del.C. § 1448 reads as follows:

### § 1448. Purchase and possession of deadly weapons by certain persons prohibited; class E felony.

Any person, having been convicted in this State or elsewhere of a felony or a crime of violence involving bodily injury to another, whether or not armed with, or having in his possession any weapon during the commission of such felony or crime of violence, or any person who has ever been committed for a mental disorder to any hospital, mental institution or sanatorium (unless he possesses a certificate of a medical doctor or psychiatrist licensed in this State that he is no longer suffering from a mental disorder which interferes with or handicaps him in the handling of a firearm), or any person who has been convicted for the unlawful use, possession or sale of a narcotic, dangerous drug or central nervous system depressant or stimulant drug as those terms were defined prior to the effective date of the Uniform Controlled Substance Act in January 1973, or of a narcotic drug or controlled substance as defined in Chapter 47 of Title 16, who purchases, owns, possesses or controls any deadly weapon is guilty of a class E felony. (11 Del.C.1953, § 1448; 58 Del. Laws, c. 497, § 1.)

11 Del.C. § 832 reads as follows:

### § 832. Robbery in the first degree.

(a) A person is guilty of robbery in the first degree when he commits the crime of robbery in the second degree and when, in the course of the commission of the crime or of immediate flight therefrom, he or another participant in the crime:

(1) Causes physical injury to any person who is not a participant in the crime; or

(2) Displays what appears to be a deadly weapon; or

(3) Is armed with and uses or threatens the use of a dangerous instrument.

Robbery in the first degree is a class B felony.

(b) Notwithstanding §§ 4205(b)(2) and 4215 of this title, a person convicted a second or subsequent time for robbery in the first degree shall be sentenced to a term of imprisonment for not less than 10 nor more than 30 years and the court shall not suspend the sentence of such person, nor give such person a probation-

ary sentence, nor shall the term of imprisonment imposed under this section run concurrently with any other term of imprisonment imposed for the commission of such offense.

(c) The minimum sentence of imprisonment required by this section and § 4205 of this title for a first offense shall not be subject to suspension, and no person convicted under this section shall be eligible for probation or parole during the first 3 years of such sentence. (11 Del.C. 1953, § 832; 58 Del.Laws, c. 497, § 1; 59 Del.Laws, c. 547, § 6; 60 Del.Laws, c. 240, §§ 1, 2.)

## APPENDIX B

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

IN AND FOR KENT COUNTY

STATE OF DELAWARE

v.

BILLY BAILEY, Defendant.

IK79–07–0202, 0203 IK79–05–0085, 0086, 0087, 0088

DEFENDANT'S REQUEST FOR VOIR DIRE QUESTIONS OF PROSPECTIVE JURORS

In addition to the questions normally propounded to the jury panel, the defendant, Billy Bailey, by and through his counsel, Nancy Jane Mullen and Howard F. Hillis, respectfully requests that the following questions be asked:

1. Are you related to, or a close friend of, anyone who has been or now is employed by any police agency?

2. Are you related to, or a close friend of, anyone who has been or now is employed by the Attorney General's Office?

3. Are you related to, or a close friend of, the defendant in this case, Billy Bailey, or any members of his family?

4. Were you related to, or a close friend of, the alleged victims in this case, or any members of their family?

5. Have you read or heard anything about this case through the news media?

6. If the answer to Question #5 is "yes":

a. What do you recall having read or heard about this case through the news media?

b. Did you discuss with anyone else what you read or heard about this case through the news media?

c. Have you formed an opinion as to the defendant's guilt or innocence in this case, as a result of what you read or heard through the news media or discussed with anyone else?

d. Would anything you read or heard about this case through the news media make it difficult for you to render a fair and impartial decision in the case, based on the evidence introduced at trial and the instructions given you by the Court?

7. Do you have any objections to, or conscientious or religious scruples against, imposition of the death penalty? *

8. If the answer to Question #7 is "yes": *

a. Would your objections or scruples regarding the death penalty prevent you from making a fair and impartial decision as to the defendant's guilt in a capital case, regardless of the facts and circumstances of the case? (If the answer is "yes" or equivocal, explore further).

b. Would your objections or scruples regarding the death penalty make it impossible for you to vote for a penalty of death in a capital case, regardless of the facts and circumstances of the case? (If the answer is "yes" or equivocal, explore further).

9. Would the nature of the offenses charged against the defendant in this case

---

* The defendant objects to any questions being propounded to the prospective jurors relating to the possible penalties which could be imposed in the present case, but suggests that the above questions be asked, should the Court inquire in this area.

make it difficult for you to render a fair and impartial verdict, based on the evidence introduced at trial and the instructions given you by the Court?

10. Have you, or has anyone close to you, ever been the victim of a crime of violence?

11. Do you understand that in a criminal case the burden of proof is on the State to establish the defendant's guilt of the crimes with which he is charged beyond a reasonable doubt, and do you believe you could give effect to this principle during your deliberations, if selected as a juror in this case?

12. Would you be able to render a fair and impartial verdict in this case, based on the evidence introduced at trial and the instructions given you by the Court, without being influenced by sympathy, vengeance, bias or favor of any kind, of fear, including the fear of later criticism or the possibility of favorable comment?

13. Do you know of any reason at all why you could not sit as a fair and impartial juror in this case?

> Respectfully submitted,
> /s/ Nancy Jane Mullen
> Nancy Jane Mullen, Esquire
> Assistant Public Defender
> /s/ Howard F. Hillis
> Howard F. Hillis, Esquire
> Assistant Public Defender
> State Office Building
> 820 French Street
> Wilmington, Delaware 19801

## OPINION ON DEATH SENTENCE

McNEILLY, Justice:

The guilt phase of this case having been decided by this Court's Opinion dated February 7, 1983, we now turn to defendant's assertions of error which he claims arose at his penalty hearing held pursuant to § 4209. At that hearing, the State presented its opening argument first, seeking the death penalty based upon the alleged exist-

ence of four statutory aggravating circumstances: "1. The murders of Mr. and Mrs. Lambertson were committed by one who had escaped from a place of confinement. The State contends the defendant had escaped from the Plummer House...." *Id.* § 4209(e)(1)(a); "2. The murders were committed while the defendant was engaged in flight after committing robbery in the first degree, at the Cheswald Beverage Mart". *Id.* § 4209(e)(1)(j); "3. The defendant's course of conduct resulted in the deaths of two or more persons wherein the deaths were the probable cause of the defendant's conduct". *Id.* § 4209(e)(1)(k); "4. The statutorily aggravating circumstance, the State will rely upon, is that the murders were so outrageously or wantonly vile, horrible or inhuman". *Id.* § 4209(e)(1)(n).

In the defendant's opening statement, counsel indicated that the evidence defendant would introduce would be brief in that they (the jury) would be permitted to rely on the evidence presented in the first phase of the trial in determining the penalty to be imposed upon defendant. Counsel characterized the murders as not being the product of a cool calculating and deliberate mind, but rather the consequence of the buildup of emotional problems in defendant over a period of years which culminated in the senseless and irrational violence and murder of the victims. Defendant was pictured by the defense not as a person supported and accepted by his family and society, but as a person rejected by his family and society virtually all his life. Counsel described defendant as one who never had the advantages most persons enjoy and take for granted, who the year before faced the loss of his wife and child and the loss of his freedom, making him a product of the State operated institutions which give little attention to the emotionally disturbed. Counsel submitted to the jury in this opening statement that defendant is deserving of pity and not vengeance, of understanding and not retribution.[1]

---

1. Counsel for defendant did not explicitly refer to the specific mitigating factors which would

## I

The first issue we address is the defendant's contention that at the penalty hearing the Trial Judge erred in instructing the jury:

> You have already convicted the defendant of causing the death of two persons; therefore, that aggravating circumstance has been established beyond a reasonable doubt and you are so instructed.

Defendant asserts that such an instruction is unconstitutional in that it establishes a conclusive presumption and obviates the requirement that the State prove the particular aggravating circumstance beyond a reasonable doubt. Secondarily, defendant asserts that the instruction violates the statutory scheme creating a bifurcated hearing. We disagree.

■ The jury at trial had found defendant guilty of Murder in the First Degree of the two victims, Clara and Gilbert Lambertson, in violation of 11 *Del.C.* § 636(a)(1). By instructing the jury that it already had established the statutory aggravating circumstance of causing the death of two persons, the Trial Judge properly instructed the jury that the aggravating circumstance set forth in 11 *Del.C.* § 4209(e)(1)(k) had been established by them at trial, i.e.,

> "The defendant's course of conduct resulted in the deaths of 2 or more persons where the deaths are a probable consequence of the defendant's conduct".

The cases cited by defendant relating to the unconstitutionality of conclusive presumptions are inapposite since they apply to trial situations and not after the verdict situations as here in a bifurcated penalty hearing.[2]

## II

We now turn to defendant's original assertion that the statutory aggravating circumstances in § 4209(e)(1)(n)—"The murder was outrageously or wantonly vile, horrible or inhuman"—is unconstitutionally vague because it does not provide a constitutionally adequate guideline to channel the discretion of the sentencing jury in imposing the death penalty. As in *Flamer v. State*, 490 A.2d 104 (Del.1983) decided this same day, however, during the pendency of this appeal, the Superior Court concluded, and this Court agreed, that this statutory aggravating circumstance is unconstitutionally vague. Therefore, like in *Flamer*, the issue became whether defendant's death penalty must be vacated because the jury was permitted to weigh the invalid circumstance although the evidence constituting the statutorily invalid circumstance was properly before the jury.

■ Rather than address question of whether a "proper" jury instruction may have cured any defect as to this invalid statutory aggravating circumstance, as the State has maintained occurred in this case, we find that the more appropriate resolution of this issue lies in our analysis of *Zant v. Stephens*, 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983) and *Barclay v. Florida*, 463 U.S. 939, 103 S.Ct. 3418, 77 L.Ed.2d 1134 (1983), set out in *Flamer*. Applying that analysis to the instant case results in a similar conclusion affirming defendant's death penalty, as we did in *Flamer*, in that under our statute, with the "weighing of aggravating and mitigating circumstances coming into play at the post-threshold discretionary stage of the jury's

---

be relied upon, preferring to let the jury draw its own conclusions from argument of counsel and the testimony elicited at trial and at the penalty hearing. Counsel for each side, however, had filed lists of aggravating and mitigating circumstances to be relied upon at the penalty hearing pursuant to 11 *Del.C.* § 4209(c)(1).

**2.** We limit our holding as to this aspect of the appeal to the situation in which the sentencing

jury is the same jury which convicted defendant. Section 4209(b)(1) contemplates the possibility that a separate and new jury be impanelled if the convicting jury cannot participate in the hearing. In this unique situation, we would require both parties to introduce evidence to support the existence of any aggravating or mitigating circumstances which they seek to prove.

determination rather than at the threshold stage where the class of cases capable of having a death penalty is circumscribed, any error that might have occurred is harmless. As we stated in *Flamer,* after distinguishing the Florida death penalty scheme in *Barclay* from our statute,

> as to any claim that the alleged duplication in statutory aggravating circumstances caused the jury to affix too much weight to them, our review of the trial transcript reveals no effort by the Trial Court to instruct the jury to "place particular emphasis on the role of statutory aggravating circumstances in [its] ultimate decision." *Zant* [103 S.Ct.] at 2749. And nowhere did the Trial Court suggest "that the presence of more than one aggravating circumstance should be given special weight *Id* at 2750. *Flamer* at 136.

Therefore, defendant's argument fails.

We do note, however, as we did in *Flamer* that:

> Our decision in this case depends in part on the existence of an important procedural safeguard, the mandatory appellate review of each death sentence ... to avoid arbitrariness and to assure proportionality. *Zant* 103 S.Ct. at 2750.

But, as we concluded in *Flamer,* the affirmance of defendant's death penalty "does not render this review any less meaningful".

### III

The last contention defendant raises is again identical to one of many issues resolved in *Flamer.* That issue concerns itself with the question of whether the imposition of the death penalty on the defendant here violates the mandates of 11 *Del.C.* § 4209 because it is disproportionate to the penalty recommended or imposed in similar cases arising under that section. Stated otherwise, we are concerned here with whether defendant's death sentence is comparatively disproportionate rather than inherently so, as the defendant in *Flamer* also raised.

The question of what standard of review to apply in comparatively proportionality reviews has never been exclusively established by the United States Supreme Court. *See Flamer* at 138. The Supreme Court has indicated, however, that where state law does not require such a review, a failure to conduct one is not in and of itself unconstitutional. *Pulley v. Harris,* 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984). But, as we stated in *Flamer,* our legislature has seen fit to require such a review thus rendering *Pulley* meaningless for our purposes. The question now becomes what is the universe of cases we consider in determining whether defendant's death penalty was disproportionate.

■ Considering the Maryland Court of Appeals decision in *Tichnell v. State,* 297 Md. 432, 468 A.2d 1 (1983), this Court in *Flamer* held that only those cases in which a § 4209 penalty hearing was held regardless of whether a life imprisonment or death sentence was imposed need be considered. Once again, we find this universe of cases to represent a sufficient cross-section of similar cases under which an adequate review can be made. *See Flamer* at 139; *Accord, Ross v. State,* 233 Ga. 361, 211 S.E.2d 356, 359 (1974). Thus, we turn to consideration of those cases and, as in *Flamer,* since the decision of this case is being published the same day as the *Flamer* decision our comparative analysis of the background of our presently existing universe of cases overlaps our discussion in *Flamer* and nothing additional need be stated.

■ Our consideration of the totality of the circumstances of this case and the propensities of the defendant, all of which are extensively set out within the ambit of this opinion, lead us to no other conclusion than that the imposition of death was neither arbitrarily nor capriciously imposed, and is not disproportionate to the penalties imposed in the other cases within the universe.

For the foregoing reasons, the convictions and sentences are hereby

\* \* \*

AFFIRMED.