**Billie BAILEY, Petitioner,**

v.

**Robert SNYDER, Respondent.**

**Civ. A. No. 92–209–RRM.**

United States District Court,
D. Delaware.

July 23, 1993.

---

Edmond D. Lyons, Jr., and David J. Lyons, Aerenson, Ferrara & Lyons, Wilmington, DE, for petitioner.

Paul R. Wallace, State of Delaware Dept. of Justice, Wilmington, DE, for respondent.

## REVISED OPINION

McKELVIE, District Judge.

This is a habeas corpus case. The petitioner, Billie Bailey, is a state prisoner. In February 1980, Bailey was convicted in the Superior Court of the State of Delaware of robbery in the first degree, possession of a deadly weapon by a person prohibited, two charges of possession of a deadly weapon during the commission of a felony, and two charges of murder in the first degree. For each of the murder convictions, Bailey was sentenced to death.

Bailey's convictions were affirmed by the Delaware Supreme Court on direct appeal. *Bailey v. State*, 490 A.2d 158 (Del.1983), *cert. denied*, 464 U.S. 867, 104 S.Ct. 205, 78 L.Ed.2d 178 (1983). Bailey's sentences were also affirmed on direct appeal. *Bailey v. State*, 503 A.2d 1210 (Del.1984).

On August 23, 1991, the Superior Court denied Bailey's motion for postconviction relief. *Bailey v. State*, No. IK–79–05–0085R1 through IK79–05–0088R1, IK79–07–0202R1, and IK79–07–0203R1, 1991 WL 190294 (Del.Super.Ct. August 23, 1991). On March 9, 1992, the Delaware Supreme Court affirmed without opinion the Superior Court's decision denying Bailey's motion. *Bailey v. State*, No. 343, 1991, 1992 WL 135161 (Del. March 9, 1992).

On April 8, 1992, Bailey filed in this Court a petition for a writ of habeas corpus. In his petition, Bailey raises the following grounds for federal habeas relief: (1) the trial court erred in not granting his motion for a change of venue based on alleged prejudicial pretrial publicity in Kent County; (2) his Sixth Amendment right to a fair trial and due process rights were violated by the misconduct of the prosecutor at the guilt/innocence phase of the trial; (3) his due process rights were violated by the trial court's reasonable doubt instruction which unfairly undercut the standard of proof; (4) his Sixth Amendment

right to a fair trial and due process rights were violated by the misconduct of the prosecutor at the capital penalty hearing; (5) his death sentences must be vacated because the jury at his capital penalty hearing was allowed to consider a statutory aggravating circumstance that was subsequently found to be unconstitutionally vague; (6) his due process rights were violated because the trial court instructed the jury at the capital penalty hearing that one statutory aggravating circumstance had already been established by virtue of the jury's earlier verdicts of guilty on two charges of murder; and, (7) his right to be free from cruel and unusual punishment will be violated if he is executed as death by hanging or lethal injection as performed in Delaware violates the Eighth Amendment.

On March 2, 1993, the Court heard oral argument on the issues raised in Bailey's petition. This is the Court's decision on the petition.

## I. FACTUAL BACKGROUND

### A. *The Murders*

The following findings are based on the Delaware Supreme Court's findings in its decision on Bailey's direct appeal, *Bailey v. State*, 490 A.2d 158 (Del.1983), the Superior Court's findings in its decision on his motion for postconviction relief, *Bailey v. State*, 1991 WL 190294 (Del.Super.Ct. August 23, 1991), and this Court's independent review of the transcripts of his trial.

In the fall of 1978, Bailey was arrested and prosecuted for passing a check with a forged endorsement. Thereafter, he was convicted of forgery. While awaiting sentencing, Bailey was housed at the Plummer House, a work release facility in Wilmington, Delaware.

In early May 1979, Bailey was released to live in Cheswold, Delaware, with his foster sister Sue Ann Coker. On May 19, 1979, at the request of the authorities at the Plummer House, Bailey returned to live at the Plummer House.

On Monday, May 21, 1979, Bailey escaped from the Plummer House. At approximately 3:30 p.m., he appeared at the home of Mrs. Coker. He told Mrs. Coker that he was upset and was not going to return to the Plummer House. At the time, Bailey was drinking from a bottle of vodka, though he did not appear to Mrs. Coker to be drunk.

At approximately 3:45 p.m., Bailey and Charles Coker, Mrs. Coker's husband, left in the Coker's truck to pick up Mrs. Coker's son at school. On the way, Bailey asked Mr. Coker to stop at a package store. Bailey entered the store and robbed the clerk at gunpoint. He emerged from the store carrying a bottle in one hand and a .22 caliber pistol in the other.

Bailey returned to the truck and told Mr. Coker that the police would soon be arriving. Bailey then requested that Mr. Coker drop him off at Lambertson's Corner, about a mile and a half away. Mr. Coker complied and then returned to the scene of the robbery to inquire about the welfare of the clerk.

Upon arriving at the package store, Mr. Coker telephoned the Delaware State Police and advised them that the perpetrator of the robbery was Billie Bailey.

In the meantime, Bailey had entered the farmhouse of 80–year–old retired farmer Gilbert Lambertson and his 73–year–old wife, Clara, and killed both of them. He shot Mr. Lambertson twice in the chest with the .22 caliber pistol, and once in the head with Mr. Lambertson's .12 gauge shotgun. He shot Mrs. Lambertson once in the shoulder with the pistol, and once in the abdomen and once in the neck with the shotgun.

After the shootings, Bailey fled. The Delaware State Police helicopter unit spotted him running across the Lambertson's field toward the woods. The co-pilot of the helicopter apprehended Bailey after Bailey had attempted to shoot him with the .22 caliber pistol.

The arresting officers then brought Bailey to a Justice of the Peace for commitment proceedings. The Justice of the Peace formally charged Bailey with the murders of the Lambertsons, advised him of his *Miranda* rights, and informed him of the nature of the charges against him and the possible penalties. During the commitment proceedings, Bailey said to the Justice of the Peace: "Go ahead and hang me you son-of-a-bitch. I killed them. Go ahead and kill me."

### B. *The Trial*

Bailey's trial began on February 12, 1980, and concluded on February 22, 1980. At the trial, Nan Perillo ("Perillo") and Howard Hillis ("Hillis"), two experienced Assistant Public Defenders, represented Bailey. Bailey's defense was that he had acted while under extreme emotional distress. Extreme emotional distress is a mitigating circumstance that reduces the crime of murder in the first degree to the crime of manslaughter. *See* 11 Del.C. § 641.

In support of his defense, Bailey presented the following evidence: (1) Bailey's mother died when he was less than a year old and his father died when he was six; (2) from age six to fourteen, Bailey lived in various foster homes; (3) after Bailey and his wife had a daughter, Bailey began to drink excessively; (4) when Bailey's daughter was three or four months old she was burned badly in an accidental fire and had to have her hand amputated; (5) because his in-laws blamed Bailey for the fire, he began to think the accident was his fault and his drinking intensified; (6) in August of 1978, Bailey's wife left him and his in-laws refused to allow him to have any contact with his daughter; (7) at about the same time, Bailey began to experience epileptic seizures; (8) in the fall of 1978, Bailey was convicted of forgery; (9) following this conviction, the State decided to seek a life sentence for Bailey as an habitual offender and this contributed substantially to the deterioration of his emotional stability; (10) Dr. Irving Weintraub, a forensic psychologist, testified that Bailey suffered from "emotional instability which has and continues to impair his capacities for independent adjustment in society"; and, (11) Mr. Ferman Franklin, an alcoholism counselor whom Bailey had visited on an outpatient basis, testified that Bailey was impulsive and had some difficulties with emotional stability.

In response to Bailey's defense of extreme emotional distress, the State called as a wit-

ness Dr. Mohammed Iqbal, a clinical psychologist at the Delaware State Hospital who had examined Bailey on one occasion. Dr. Iqbal testified that Bailey was not psychotic or mentally ill. He further testified that the determination of the existence of extreme emotional distress is not properly within the expertise or terminology of a clinical psychologist. The State also called as a witness Dr. Robert Buckley, a psychiatrist and the medical director of Delaware State Hospital. Dr. Buckley testified that based on his own examination of Bailey, Bailey did not have a mental disease or defect.

On February 22, 1980, the jury returned with its verdict, finding Bailey guilty of robbery in the first degree, possession of a deadly weapon by a person prohibited, two charges of possession of a deadly weapon during the commission of a felony, and two charges of first degree murder.

On February 25, 1980, after a capital penalty hearing, the jury unanimously recommended that Bailey receive a sentence of death for each of the first degree murder convictions.

### C. Post–Trial Procedural History

Bailey appealed his convictions and his sentences. Perillo and Hillis planned to share the responsibilities in presenting Bailey's appeal: Hillis was to review the record and prepare a statement of facts from which the issues could be identified; and Perillo was to research and write the legal arguments. In April of 1980, Perillo prepared a memo outlining certain issues she believed should be included on appeal. In April of 1981, however, prior to the start of the briefing on Bailey's appeal, Perillo left the Public Defender's Office and took a job with the Delaware Attorney General's Office.

In July of 1981, Hillis filed an opening brief in the Delaware Supreme Court on Bailey's behalf. Thereafter, Richard Fairbanks, then an appellate attorney with the Public Defender's Office, examined Hillis' opening brief and expressed his concerns to Perillo about the adequacy of the briefing on the death penalty issues.

On August 15, 1981, Perillo wrote a letter to the Delaware Supreme Court expressing her concerns about the adequacy of Hillis' brief. After Perillo sent this letter, Larry Sullivan, the Chief Deputy Public Defender, assigned Gregg Wilson to write a supplemental brief on Bailey's behalf. Wilson discussed various issues with Hillis, reviewed the transcript, and filed a supplemental brief.

In November of 1982, Perillo returned to the Public Defender's Office and was reassigned to work on Bailey's case.

On February 7, 1983, the Delaware Supreme Court affirmed Bailey's convictions, *Bailey v. State,* 490 A.2d 158 (Del.1983), *cert. denied,* 464 U.S. 867, 104 S.Ct. 205, 78 L.Ed.2d 178 (1983) (*"Bailey I"*), but deferred consideration of the penalty phase issues pending forthcoming decisions by the United States Supreme Court in two death penalty cases. On September 20, 1984, following the decisions in *Zant v. Stephens,* 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983), and *Barclay v. Florida,* 463 U.S. 939, 103 S.Ct. 3418, 77 L.Ed.2d 1134 (1983), the Delaware Supreme Court affirmed Bailey's sentences. *Bailey v. State,* 503 A.2d 1210 (Del.1984) (*"Bailey II"*).

On December 5, 1985, Perillo filed on behalf of Bailey a motion for postconviction relief in the Superior Court alleging, *inter alia,* that she and Hillis had provided Bailey with constitutionally ineffective assistance of counsel. Because Perillo would necessarily be a witness at an evidentiary hearing on Bailey's motion, the Superior Court granted Perillo's motion to withdraw as Bailey's attorney and appointed James A. Robb ("Robb") to represent him.

By letter to the Superior Court dated January 30, 1986, Robb informed the Court that Bailey wished to withdraw his motion for postconviction relief and abandon all further attempts to delay his execution. After conferring with counsel for the State and the defendant, the Superior Court authorized psychological examinations of Bailey for the purpose of evaluating his mental competency.

On August 27, 1986, after Bailey had refused to cooperate with efforts to evaluate his mental competency, the Superior Court

held a hearing to determine if Bailey's attempted waiver of his right to present further challenges to his convictions and sentences would be accepted. At the hearing, Bailey testified that he did not wish to pursue further postconviction relief.

On September 10, 1986, the Superior Court issued an Opinion finding that Bailey was not suffering from a mental illness or defect and that he had voluntarily, knowingly, and intelligently waived his right to pursue further postconviction remedies. *State v. Bailey*, 519 A.2d 132 (Del.Super.Ct.1986) (*"Bailey III"*).

On September 19, 1986, on behalf of Bailey, Robb appealed the Superior Court's decision. When the State challenged Robb's authority to pursue the appeal in light of Bailey's waiver, the Delaware Supreme Court appointed Robb as *amicus curiae* to advance the issue of Bailey's competence.

After briefing and oral argument, Robb advised the Delaware Supreme Court that Bailey had changed his mind and now desired to pursue his postconviction remedies. The Supreme Court then appointed Edmond D. Lyons, Jr. ("Lyons") to represent Bailey.

On February 20, 1987, Lyons filed a motion on behalf of Bailey to dismiss as moot Bailey's appeal from the Superior Court's decision finding Bailey's waiver of his right to pursue postconviction remedies to be valid. On April 20, 1987, the Delaware Supreme Court granted the motion and dismissed Bailey's appeal as moot. *Bailey v. State*, No. 292, 1986, 1987 WL 37178 (Del. April 20, 1987) (en banc). In its order, the Court rejected the State's argument that dismissal of the appeal as moot should preclude Bailey from pursuing further postconviction relief. The Court concluded that if Bailey wished to assert any claims in addition to those asserted in the motion prepared by Perillo, he should do so through an amendment to that motion.

On June 8, 1987, Bailey filed in the Superior Court an amended motion for postconviction relief. The amended motion included allegations that his trial and appellate counsel were constitutionally ineffective.

From November 2, 1988, through November 5, 1988, the Superior Court held an evidentiary hearing on Bailey's allegations of ineffective assistance of counsel. Both Perillo and Hillis testified at that hearing.

On August 23, 1991, the Superior Court issued an Opinion denying Bailey's motion for postconviction relief. *Bailey v. State*, No. IK–79–05–0085R1 through IK79–05–0088R1, IK79–07–0202R1, and IK79–07–0203R1, 1991 WL 190294 (Del.Super.Ct. August 23, 1991) (*"Bailey IV"*). In its decision, the Superior Court found that Bailey's counsel had not been constitutionally ineffective. The Court re-sentenced Bailey to be executed by hanging or, at his election, by lethal injection.

On March 9, 1992, the Delaware Supreme Court affirmed without opinion the Superior Court's decision denying Bailey's motion for postconviction relief. *Bailey v. State*, No. 343, 1991, 1992 WL 135161 (Del. March 9, 1992).

On April 8, 1992, Bailey filed in this Court a petition for a writ of habeas corpus. On April 24, 1992, the Court entered an Order staying Bailey's execution until further Order of the Court.

## II. DISCUSSION

Before considering the merits of Bailey's claims, the Court must determine whether Bailey has exhausted each of his claims in state court and whether federal habeas review of any of Bailey's claims is barred because a Delaware State court has concluded Bailey defaulted the claim pursuant to a State procedural rule.

■ In order to demonstrate that each claim has been "exhausted" in state court, Bailey must show that he presented each to the Delaware Supreme Court. *See Picard v. Connor*, 404 U.S. 270, 275, 92 S.Ct. 509, 512, 30 L.Ed.2d 438 (1971); *Toulson v. Beyer*, 987 F.2d 984, 986 (3d Cir.1993). As to each of Bailey's seven claims, he has satisfied this exhaustion requirement through presentation upon direct appeal or in state post-conviction proceedings. *See Bailey I; Bailey II; Bailey IV; Bailey v. State*, No. 343, 1991, 1992 WL 135161 (Del. March 9, 1992).

The State contends, however, that federal habeas review of several of Bailey's claims is barred by the adequate and independent state procedural grounds doctrine. In *Coleman v. Thompson*, 501 U.S. 722, 724, 111 S.Ct. 2546, 2551, 115 L.Ed.2d 640, 669 (1991), the United States Supreme Court held:

> In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.

The State contends Bailey has defaulted his claims regarding: (1) the trial court's reasonable doubt instruction; (2) prosecutorial misconduct at the guilt/innocence phase of the trial; and, (3) prosecutorial misconduct at the capital penalty hearing. Bailey does not disagree with the State's contention that these claims were procedurally defaulted in state court, rather he contends that the ineffectiveness of his trial and appellate counsel constitutes "cause" for his procedural default and that he suffered actual prejudice as a result of the alleged constitutional violations.[1]

In order to demonstrate that ineffective assistance of counsel constitutes "cause" for the default of a claim, Bailey must satisfy the two-prong test set forth by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). First, Bailey must show that his counsel's representation fell below an objective standard of reasonableness. *Id.* at 688, 104 S.Ct. at 2064–65. Second, Bailey must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. at 2068. Although this Court must make its own determination as to the constitutionality of the representation Bailey received, the Court must accept the findings of the state courts regarding the underlying facts of Bailey's counsels' performance. *See Reese v. Fulcomer*, 946 F.2d 247, 254–55 (3d Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1679, 118 L.Ed.2d 396 (1992).

The Court will now turn to a discussion of each of the claims Bailey has procedurally defaulted. Within the discussion of each of these claims, the Court will address Bailey's argument that ineffective assistance constitutes "cause" for the default of that claim. Following the discussion of Bailey's procedurally defaulted claims, the Court will address the merits of Bailey's four remaining claims.

### A. Procedurally Defaulted Claims

#### 1. Reasonable doubt instruction

In his first claim for relief, Bailey contends the trial court's instruction on reasonable doubt was erroneous and violated his due process rights. Specifically, Bailey argues that by equating reasonable doubt with "a substantial doubt" the trial court unfairly undercut the reasonable doubt standard of proof.

The trial court instructed the jury in pertinent part as follows:

> Reasonable doubt does not mean a vague, speculative or whimsical doubt, nor a mere possible doubt, but a substantial doubt and such a doubt as intelligent, reasonable and impartial men and women may honestly entertain after a careful and conscientious consideration of the evidence in the case.

Trial Transcript Volume at 234–35 ("Tr. VI, at ___"). Bailey did not object to this instruction at trial, nor did he challenge the instruction on direct appeal. Bailey raised his objection to the instruction for the first time in his motion for postconviction relief in Superior Court. In his motion, Bailey urged the Superior Court to excuse his procedural default and consider the merits of his claim on the grounds that in failing to object to the instruction, his trial and appellate counsel were ineffective within the meaning of *Strickland.*

---

1. Bailey has presented his ineffective assistance of counsel argument only as a ground for excusing the procedural default of three of his claims in state court. He has not argued that ineffective assistance of counsel constitutes an independent basis for federal habeas relief.

The Superior Court found that neither trial nor appellate counsel had been constitutionally ineffective, and, therefore, consideration of Bailey's claim was barred by Super.Ct.Crim.R. 61(i)(3). *Bailey IV*, at 25. The Superior Court noted that even if Bailey had not procedurally defaulted this claim, Bailey would not be entitled to relief as the trial judge did not err by giving the challenged reasonable doubt instruction. *Id.* The Delaware Supreme Court had approved virtually the same instruction one year before Bailey's trial. *See Wintjen v. State*, 398 A.2d 780, 781 n. 2 (Del.1979).

■ Bailey now seeks federal habeas relief on the ground that the reasonable doubt instruction was constitutionally deficient in light of the United States Supreme Court's decision in *Cage v. Louisiana*, 498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990). In *Cage*, the Supreme Court reversed the judgment of the Supreme Court of Louisiana finding that a particular reasonable doubt instruction was not constitutionally defective. The instruction at issue equated reasonable doubt with "an actual substantial doubt," and a "grave uncertainty," and further communicated to the jury that it should reach a "moral certainty" about the defendant's guilt. In considering the instruction as a whole, the United States Supreme Court found that the words "grave" and "substantial" combined with the reference to a "moral" rather than an evidentiary certainty unconstitutionally undercut the reasonable doubt standard of proof. *Cage*, 498 U.S. at 40–41, 111 S.Ct. at 329–30, 112 L.Ed.2d at 342.

In response to Bailey's claim, the State contends federal court review of the merits of the claim is barred for two reasons. First, Bailey has procedurally defaulted this claim and cannot show "cause" for his default. Second, *Teague v. Lane*, 489 U.S. 288, 300, 109 S.Ct. 1060, 1069–70, 103 L.Ed.2d 334, 348–49 (1989), bars retroactive application of "new" constitutional rules in habeas proceedings and Bailey is seeking to invoke the "new" rule announced in *Cage*.

■ Whether a federal habeas petitioner's claim seeks relief based on a "new" rule is properly treated as a threshold question. *Teague*, 489 U.S. at 300, 109 S.Ct. at 1069–70,

103 L.Ed.2d at 348–49. *See also Zettlemoyer v. Fulcomer*, 923 F.2d 284, 303 (3d Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 280, 116 L.Ed.2d 232 (1991). Thus, courts should analyze the "newness" of a rule for *Teague* purposes before addressing the question of procedural default. *Smith v. Black*, 904 F.2d 950, 982 (5th Cir.1990).

■ A case announces a "new" rule if the result was not *dictated* by precedent existing at the time the defendant's conviction became final. *Teague*, 489 U.S. at 301, 109 S.Ct. at 1070, 103 L.Ed.2d at 349–50 (emphasis in original). If a rule is "new," it should not be applied retroactively in federal habeas proceedings unless it falls under one of two exceptions. *Teague*, 489 U.S. at 307, 109 S.Ct. at 1073–74, 103 L.Ed.2d at 353–54. The first exception permits retroactive application of "new" rules that place "certain kinds of primary, private individual conduct beyond the power of the criminal law-making authority to proscribe." *Id.* The second exception permits retroactive application of "new" rules that require the observance of procedures that are "implicit in the concept of ordered liberty." *Id.*

For the following reasons, the Court agrees with the State that the rule announced in *Cage* is a "new" rule and is, therefore, nonretroactive under *Teague*. First, at least one other court has already concluded that the decision in *Cage* created a "new" rule for *Teague* purposes. *See Skelton v. Whitley*, 950 F.2d 1037, 1043 (5th Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 102, 121 L.Ed.2d 61 (1992). In concluding that the rule was "new", the *Skelton* Court relied upon the fact that the Louisiana Supreme Court had consistently upheld jury instructions that were virtually identical to the instruction found unconstitutional in *Cage*. Similarly, the reasonable doubt instruction challenged by Bailey was specifically approved by the Delaware Supreme Court one year before Bailey's trial began. *See Wintjen v. State*, 398 A.2d 780, 781 n. 2 (Del.1979).

■ Second, the function of this Court on habeas review is to determine whether a state court considering Bailey's claim at the

time his conviction became final would have been compelled by existing precedent to conclude that the rule upon which Bailey relies was required by the Constitution. *See Saffle v. Parks,* 494 U.S. 484, 488, 110 S.Ct. 1257, 1260, 108 L.Ed.2d 415, 424 (1990). Bailey's conviction became final in 1985 when the United States Supreme Court denied his second petition for certiorari. *See Zettlemoyer v. Fulcomer,* 923 F.2d 284, 305 & n. 18 (3d Cir.1991). At that time, *Cage* had not yet been decided and there was no precedent dictating that the Delaware state courts find the Constitution required a reasonable doubt instruction different from the instruction approved in *Wintjen, supra.*

Having determined that the rule announced in *Cage* is "new," consideration of Bailey's claim is precluded unless it falls within one of the two *Teague* exceptions described above. As Bailey has not argued his claim properly falls under either exception, the Court concludes that consideration of Bailey's claim is barred by *Teague.*

■ Even if the Court were to find that *Cage* did not create a "new" rule, Bailey has procedurally defaulted his reasonable doubt instruction claim. *See Bailey IV,* at 25. Accordingly, the Court could consider the merits of Bailey's claim only if he could show sufficient "cause" to excuse his default and also show prejudice resulting from the alleged constitutional violation. *Coleman v. Thompson,* 501 U.S. at 749–50, 111 S.Ct. at 2564–65, 115 L.Ed.2d at 669.

■ Bailey alleges that ineffective assistance of counsel constitutes "cause" for his procedural default. It is clear, however, that Bailey's counsel did not object to the instruction at trial or on appeal because the instruction conformed with Delaware law at the time of Bailey's trial. *See* Transcript of the Superior Court Evidentiary Hearing Volume B, at 162–63 ("Ev. Tr. B, at __"). The Court cannot conclude that Bailey's counsel was objectively unreasonable for failing to challenge an instruction that was specifically approved by the Delaware Supreme Court one year before Bailey's trial. *See Wintjen,* 398 A.2d at 781 n. 2. As Bailey has failed to satisfy the first prong of the *Strickland* test, he has failed to establish "cause" for his

procedural default, and, therefore, consideration of the merits of his claim is precluded by *Coleman v. Thompson,* 501 U.S. at ——, 111 S.Ct. at 2564–65, 115 L.Ed.2d at 669.

### 2. *Prosecutorial misconduct during the guilt/innocence phase of the trial*

In his second claim for relief, Bailey argues prosecutorial misconduct during the guilt/innocence phase of the trial violated his right to a fair trial under the Sixth Amendment and his due process rights. In support of his argument, Bailey cites the following as evidence of prosecutorial misconduct. First, Bailey was tried in the Superior Court in Dover, Kent County, Delaware, and in his opening statement, the prosecutor, James Liguori, introduced defense counsel as "attorneys from Wilmington" and the victims as an "Old Kent County farmer" and his wife. Tr. II, at 145, 149.

Second, in final argument, the prosecutor commented on Bailey's defense of extreme emotional distress as follows:

> Mr. Hillis [Bailey's attorney] in good faith stood up here and told you, well, really, ladies and gentlemen, in good faith I can't say he is a white knight in shining armor. No, he is just sick, lonely, isolated, unloved person and the defendant Billie Bailey was also a victim in this case. That is Mr. Hillis telling you in good faith.

Tr. VI, at 172.

Third, Bailey suggests that the prosecutor improperly baited him into an outburst before the jury. In his closing argument, the prosecutor referred to Dr. Iqbal's testimony that Bailey had the ability to control his emotions. In support of Dr. Iqbal's conclusions, the prosecutor then noted that:

> The defendant himself through this agonizing trial, through this he is controlling his emotions. He is controlling his emotions. He is controlling his emotions because he wants to. You see—

Tr. VI, at 179. At that point Bailey interjected and said:

> The only reason I am controlling them is because I don't want to bust you in the fucking mouth.

Tr. VI, at 179. Thereafter, the trial court declared a brief recess, ordered that Bailey be removed from the courtroom, and advised Bailey's counsel that Bailey could return to the courtroom if he gave the court assurances that there would be no more outbursts. Bailey advised the court through his attorneys that he could provide no such assurances, and, therefore, Bailey did not return to the courtroom for the balance of the guilt/innocence phase of the trial.

Fourth, Bailey objects to several comments made by the prosecutor in rebuttal regarding Bailey's defense of extreme emotional distress. Among those comments are the following:

> What are we going to say? Okay, Billy, you have an excuse. You have a ticket out of here Billy. You can kill those two old people.... You get a free shot. Go ahead, Bill, shoot them both. Kill them, brutalize them, do what you want. Go ahead, Bill, because you can do that. We are going to let you—as society we are going to let you get away with that Bill.... and the truth is that it is a con and you know it is a con and I am not going to belabor it any longer. That is a con and if you say, Billy Bailey, you have those present thoughts because of what happened to you when you were four or when you were six or when you were ten or when you were twenty or twenty eight, okay, Bill, go ahead, but God forbid there are other people just like him. Other people have done better and he is not going to get away with this.... Mr. Hillis, I think was trying to put a little sawdust in your eyes when he was trying to tell you all this stuff, just throwing that stuff in your eyes.... It is your duty, it is your job to say, okay, all you orphans out there, all you people, we are not taking any of this garbage anymore.

Tr. VI, at 210–13. The prosecutor then referred to Bailey's defense as "baloney, absolute baloney." Tr. VI, at 215.

Bailey did not object at trial to any of the comments made by the prosecutor, nor did Bailey raise the issue on direct appeal. Bailey presented this claim for the first time in his Superior Court motion for postconviction relief. In its decision on Bailey's motion, the Superior Court found that Bailey was barred from raising the claim because: (1) he had not objected to the prosecutor's comments at trial; (2) he had not shown cause to excuse his procedural default or prejudice resulting from the prosecutor's comments; and, (3) even if he had shown cause and prejudice, his claim would fail on the merits. *Bailey IV*, at 18. The Superior Court also found that Hillis' decision not to object to the prosecutor's remarks was a strategic decision "within the wide range of reasonable assistance of counsel." *Id.* at 22.

■ In seeking to raise his claim of prosecutorial misconduct before this Court, Bailey argues the ineffectiveness of his counsel constitutes "cause" for his procedural default. In support of this argument, Bailey points to Perillo's testimony at the Superior Court evidentiary hearing. Perillo testified that the failure to object at trial to the comments made by the prosecutor "was inexcusable both on her part and on the part of Mr. Hillis." Ev. Tr. A, at 104. She also testified that her failure to object was not a part of the trial strategy, but was due largely to her having been schooled in a tradition that frowned on objections to closing arguments. *Id.*

On the other hand, Hillis testified that although he believed the prosecutor's remarks were "questionable in some sense," he made a conscious strategic decision not to object at trial for the following reasons. First, he felt some of the statements were not damaging. Second, he believed he could deal effectively with the prosecutor's tactics in his own final argument. Third, he felt the jury would be repulsed by the prosecutor's comments. Specifically, Hillis testified that the prosecutor "had become his own worst enemy and letting him alone with his attitudinal approach and his arrogance played to our advantage." Ev. Tr. B, at 103. Fourth, Hillis believed from his previous contact with the trial judge, that the judge would not grant a mistrial based on the prosecutor's arguments. Hillis further testified that he did not raise the issue of prosecutorial misconduct on appeal because he did not think

such an argument would be successful. Ev. Tr. B, at 101–106.

In challenging the reasonableness of his representation, Bailey must "overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065, 80 L.Ed.2d at 694–95. In light of Hillis' testimony and the Superior Court's finding that Hillis made a strategic decision not to object to the prosecutor's comments, and despite Perillo's testimony to the contrary, the Court finds that Bailey has not established that his counsel was objectively unreasonable. For example, it was objectively reasonable for Hillis to conclude that the prosecutor's acerbic comments undermined the State's case more than they hurt Bailey's case. It was also objectively reasonable for Hillis to respond to the prosecutor's remarks by addressing them in his own closing argument rather than by making an objection, as Hillis believed the trial judge would not be receptive to such an objection.

Bailey has also not shown that he was prejudiced by the prosecutor's remarks. That is, Bailey has not offered any evidence tending to show that, but for counsel's alleged unprofessional errors, there would have been a different outcome at trial. Accordingly, as Bailey has not satisfied either prong of the *Strickland* test, consideration of the merits of Bailey's claim is barred by *Coleman v. Thompson,* 501 U.S. at 749–50, 111 S.Ct. at 2564–65, 115 L.Ed.2d at 669.

Assuming *arguendo* that Bailey had satisfied the *Strickland* test and the Court had found cause and prejudice excusing Bailey's procedural default, Bailey's claim fails on the merits. In order to succeed on his claim, Bailey must show that the prosecutor's remarks "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *United States ex. rel. Perry v. Mulligan,* 544 F.2d 674, 678 (3d Cir.1976), *cert. denied,* 430 U.S. 972, 97 S.Ct. 1659, 52 L.Ed.2d 365 (1977) (quoting *Donnelly v. De Christoforo,* 416 U.S. 637, 643, 94 S.Ct. 1868, 1871, 40 L.Ed.2d 431, 437 (1974)). Bailey has not met this standard. First, nothing the prosecutor said misrepresented the elements of Bailey's defense of extreme emotional distress or drew the jury away from its responsibility to analyze the evidence Bailey presented regarding his emotional condition. Although the prosecutor may have used improper language to attack Bailey's defense, he did not unfairly put matters before the jury that the jury should not have considered. Further, Hillis had an opportunity in his closing argument to argue to the jury that Bailey had in fact established the elements of the extreme emotional distress defense and the trial judge properly instructed the jury on Bailey's defense. Tr. VI, at 185–208, 222–224.

Second, nothing in the record suggests that by commenting on Bailey's emotional control during the trial the prosecutor was attempting to bait Bailey into an outburst rather than straightforwardly attack the credibility of Bailey's defense.

Third, in determining whether the prosecutor's comments rendered Bailey's trial unfair, the Court looks to the strength of the State's case. *See Brooks v. Francis,* 716 F.2d 780 (11th Cir.1983). In light of the overwhelming evidence against Bailey, the prosecutor's comments did not make the resulting conviction a denial of due process.

### 3. *Prosecutorial misconduct at the penalty hearing*

In his third claim for relief, Bailey argues prosecutorial misconduct in argument at the penalty hearing deprived him of a fair trial under the Sixth Amendment and violated his due process rights. Bailey challenges the prosecutor's references to the State's opinion on the issue of the death penalty, his comments containing religious overtones, his references to the jury's duty to sentence Bailey to death, and his argument that a death penalty verdict in Bailey's case might protect the innocent by deterring similar murders. Specifically, Bailey objects to the following prosecutorial comments. First, Bailey complains that during opening argument at the penalty hearing, the prosecutor advised the jury that:

> The State unequivocally and vigorously at this time recommends to the jury that they

return a verdict of death.... The State is confident that you will do your duty and return such a verdict.

Tr. VII, at 245–46.

Second, in his closing argument, the prosecutor advised the jury that:

There is no retribution. This is simply what is due the defendant. This is his day of atonement and his day of atonement will be today.

The State has no desire to kill Billie Bailey, simply to get even with him. We do not intend to do that, to simply get even with him. The truth is that because of the outrageous nature of these crimes, the way they were so brutal, it is simply that society, our society insists on adequate punishment because he deserves it. It is as simple as that. He deserves it.

There is basically a certain rationale, a balancing point I have found with regard to the death penalty and on one hand the death penalty is concerned with the deeply rooted beliefs of retribution, vengeance and atonement, as I specified earlier, and on the other hand it is the belief and the dignity of common man and the State says in the dignity of the common man for our society, the foundation of our society is that we follow rules and when someone violates those rules we punish them. We punish them consistently with the violation.

The State says the punishment here, to coin an old phrase, does fit the crime. The punishment is death. We are not after our pint of blood. We are after justice. We want the Defendant to own up and to suffer for what he did to them. It is as simple as that. Thank you.

Tr. VII, at 260–61.

Third, in his rebuttal argument, the prosecutor cautioned the jury against being:

badgered or embarrassed into doing or shirking from responsibility that you swore you would do. The State submits you are not committing any act of barbarism. Do not be embarrassed into suggesting and

thinking that you are committing any act of barbarism.

Tr. VII, at 266.

Fourth, after an objection by Bailey's counsel as the prosecutor was apparently about to refer to previous trials in Kent County, the prosecutor continued:

Now, the rest of my remarks will simply be that I am wondering if our society that we all have a little part of, we all try to do our own for our society—I wonder if we've gone so far as to threaten the innocent by sparing the guilty. Have we gone that far to threaten all innocent people by sparing guilty people, or, as I said earlier, it is not Clara and Gilbert versus the defendant....

What you may do by speaking out loudly and clearly is that anyone else similarly situated in telling them you are not going to stand for it. We are not going to stand for it and that is why death is the alternative for him, to let other people with his propensities know that, that we are not going to take this.

Tr. VII, at 267–68. At that point, the defendant who had been seated in the courtroom for the penalty hearing shouted out: "bring it on then mother fucker." The trial judge then expelled the defendant from the courtroom. The prosecutor went on to conclude his argument:

Ladies and Gentleman, I believe and the State submits that you will do your duty and your voice will be heard loud and clear that in Delaware you will not threaten the innocent by letting the guilty go free. Thank you.

Tr. VII, at 269.

Bailey did not object to any of these comments at trial, nor did he raise the issue on direct appeal. Bailey raised this claim for the first time in his Superior Court motion for postconviction relief. At the Superior Court's evidentiary hearing on the alleged ineffective assistance of Bailey's counsel, Perillo and Hillis gave contradictory testimony on their reasons for not objecting to the prosecutor's comments at the penalty hearing. Perillo testified that the failure to raise the issue of prosecutorial misconduct at the

penalty hearing and on direct appeal constituted ineffective assistance of counsel. Hillis did not agree and asserted that he chose for strategic reasons not to object at the hearing to the prosecutor's comments or to raise the issue on appeal.

In its decision on Bailey's motion, the Superior Court assumed without deciding that ineffective assistance of counsel provided "cause" for Bailey's procedural default and found that although the prosecutor's comments were not within the permissible range of advocacy, Bailey had failed to show that he was prejudiced by the prosecutor's comments. *Bailey IV,* at 25.

For the reasons set forth above in Section II.A.2, the Court concludes that Bailey has not shown that his counsel was ineffective within the meaning of *Strickland* and, therefore, has failed to show "cause" for the procedural default of this claim. Nevertheless, for the following reasons the Court concludes that even if Bailey had not defaulted this claim, it would fail on the merits.

 First, the prosecutor's reference to Bailey's "day of atonement," is not the type of religious reference courts have found to be improper. *See, e.g., United States v. Giry,* 818 F.2d 120, 133–34 (1st Cir.), *cert. denied,* 484 U.S. 855, 108 S.Ct. 162, 98 L.Ed.2d 116 (1987) (prosecutor referred to defendant's denial of Christ). Considered in the context of his entire statement, the prosecutor's reference to Bailey's "day of atonement" did not involve an untoward request for the jury to sentence Bailey for some religious purpose. Second, prosecutors are permitted to argue in favor of the purposes of the death penalty, including the goals of retribution and deterrence. *See Lesko v. Lehman,* 925 F.2d 1527, 1545 (3d Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 273, 116 L.Ed.2d 226 (1991). Finally, although the Court agrees with the Superior Court's conclusion that several of the remarks made by the prosecutor were improper, the Court does not find that the remarks were of such a nature as to render Bailey's penalty hearing unfair. *See De Christoforo,* 416 U.S. at 637, 94 S.Ct. at 1868, 40 L.Ed.2d at 431.

### B. Bailey's Remaining Claims

The Court now turns to an analysis of the claims that Bailey has not procedurally defaulted.

#### 1. Change of venue

Prior to his trial, Bailey filed a motion for a change of venue, to move the trial from Kent County, where the murders occurred, to New Castle County. Bailey argued prejudicial pretrial publicity made it impossible for him to receive a fair trial in Kent County. In support of the motion, Bailey submitted fourteen articles, eight photographs, and two editorials from the Delaware State News, a daily newspaper circulated primarily throughout the area of Kent County, all of which had appeared in the newspaper within three weeks of the murders. Among other things, the articles referred to area residents' fears following the killings and to their anger over Bailey's easy escape from the Plummer House. The articles also mentioned the community's hope that retribution would be exacted for Bailey's crimes.

After a hearing, the trial judge, George R. Wright, preliminarily denied Bailey's motion. Judge Wright stated he was not convinced the publicity was so extensive and so inflammatory and prejudicial as to preclude the selection of a fair and impartial jury, but deferred a final ruling on the motion pending efforts to select an impartial jury from a panel drawn from Kent County.

On February 12, 1980, eight months after the murders, the trial court began the process of selecting a jury for Bailey's trial. First, the Prothonotary and the Court asked the entire panel of 80 prospective jurors the following questions: (1) Do you know anything about this case either through personal knowledge, discussion with anyone else or the news media? (2) Do you know the defendant or any of his relatives? (3) Do you know the attorneys in this case or any other attorneys employed in the office of the Attorney General or defense counsel? (4) Do you know any of the prospective witnesses? (5) Do you have any bias for or against the defendant? (6) Are you related to or a close friend of anyone who has been or now is employed by a police agency? (7) Are you related to or a close friend of anyone who has

been or now is employed in the Attorney General's Office? and, (8) Are you related to or a close friend of the alleged victims in this case or any members of their family? The Prothonotary then asked anyone who had answered yes to any of the questions to come forward. The trial transcript reflects that in response to the foregoing inquiries only four members of the jury panel came forward, Tr. I at 11; however, the parties now agree the transcript is in error: forty-three, not four, members of the panel of eighty came forward. The trial judge then excused until 10:00 a.m. the next morning the forty-three panel members who had given an affirmative answer to any of the questions.

The thirty-seven members of the jury panel who had not given an affirmative response to any of the questions stayed in the courtroom to continue to participate in the jury selection process. The trial judge asked each panel member to come forward one at a time to answer the following questions: (1) If the evidence justifies it, could you return a verdict in a case where you knew the death penalty would be imposed? and, (2) Have you formed or expressed an opinion as to the guilt or innocence of the defendant in this case? During the colloquies with these thirty-seven panel members, the trial judge excused four who indicated they could not return a verdict knowing the death penalty would be imposed, Bailey's counsel used peremptory challenges to strike sixteen, and the prosecutor used peremptory challenges to strike six. Both sides accepted the remaining eleven panel members and the clerk swore them in as jurors for Bailey's trial.

The next day, February 13, 1980, the forty-three panel members who had responded affirmatively to at least one of the Court's or the Prothonotary's questions the day before, returned to continue participating in the jury selection process. The trial judge called panel members forward one at a time and asked each one to explain his or her reason for giving an affirmative answer to a question asked the day before. Of the first twenty-four panel members called forward, the trial judge excused eighteen for cause, Bailey's counsel used peremptory challenges to strike four, and the prosecutor used peremptory challenges to strike two. Kenneth Brenton was the twenty-fifth juror called forward. Mr. Brenton indicated he had responded affirmatively to two questions asked the day before. First, he responded affirmatively to question (6) (Are you related to or a close friend of anyone who has been or now is employed by a police agency?) because he had two brothers on the police force in Massachusetts. Upon questioning by the trial judge, Mr. Brenton stated his brothers' positions as police officers would not affect his ability to be an impartial juror in a case in which a Delaware State Police officer testified. Second, Mr. Brenton had responded affirmatively to question (4) (Do you know any of the prospective witnesses?) because James Edge was a prospective witness in the case and he had been Mr. Edge's supervisor at General Foods in 1977. Upon questioning by the trial judge, Mr. Brenton stated he was not a personal friend of Mr. Edge's and that he could be an impartial juror in a case in which Mr. Edge testified. Bailey's counsel had exhausted their peremptory challenges by this point and did not move to excuse Mr. Brenton for cause. As the prosecutor accepted Mr. Brenton, the clerk swore him in as juror number twelve for the trial.

The trial judge then continued questioning panel members in an effort to select two alternate jurors. Bailey's counsel and the prosecutor received two additional peremptory challenges for use in the selection of alternate jurors. Linda Martin was the twenty-ninth panel member questioned that day. Ms. Martin indicated she had responded affirmatively to question (3) (Do you know the attorneys in this case or any other attorneys employed by the office of the Attorney General or defense counsel?) because she was a casual acquaintance of an attorney in the civil division of the Attorney General's Office. Upon questioning by the trial judge, she stated her relationship with this attorney would not affect her ability to be an impartial juror in a case the Attorney General's Office was presenting. Bailey's counsel and the prosecutor accepted Ms. Martin as an alternate.

After questioning the thirty-seventh panel member of the day and finding her unable to

sit for a two-week trial, the trial judge discontinued jury selection procedures and decided to begin the trial with twelve jurors and one alternate. It appears there were additional panel members available had the trial judge desired to continue the process of selecting an alternate.

 Bailey argues that the large percentage of panel members who knew the family of the deceased or potential witnesses in the case, or had informed the court they already had formed an opinion about the case, combined with the substantial pretrial publicity concerning Bailey's crimes demonstrates that the trial court erred in denying Bailey's motion to change venue.

For the following reasons, the Court finds Bailey's claim lacks merit. First, the Delaware Supreme Court found that pretrial publicity relating to the matter was devoted largely to negative political reaction to the work release program to which Bailey had been assigned at the time of the murders, and was not "convict-or-else" publicity. *Bailey I*, 490 A.2d at 162. As such, the Delaware Supreme Court approved the trial court's decision to delay ruling on Bailey's motion for a change of venue pending efforts to select a fair and impartial jury. *Id.* This Court agrees with the Delaware Supreme Court's finding that the publicity surrounding Bailey's crimes was not so prejudicial and inflammatory as to preclude the selection of an impartial jury, and, therefore, that the trial court properly deferred ruling on Bailey's motion.

 Second, Bailey does not allege, and the record does not support, a claim that any jurors were improperly seated or were biased. The first eleven jurors seated did not respond affirmatively to any of the questions asked in *voir dire* on the first day of jury selection. As discussed above, juror number twelve responded affirmatively to two questions asked in *voir dire;* however, Bailey did not move to exclude this juror for cause, and the trial court and the Delaware Supreme Court found that juror number twelve was properly seated. *Bailey I*, 490 A.2d at 164–166. These findings are presumptively correct in this action. *Patton v. Yount,* 467 U.S. 1025, 1038, 104 S.Ct. 2885, 2892–93, 81

L.Ed.2d 847, 858 (1984). Furthermore, Bailey's counsel accepted the alternate, juror number thirteen, without challenge despite her having responded affirmatively to one question asked in *voir dire.*

Third, whether jurors twelve and thirteen were chosen from four or forty-three persons who had some knowledge of the case, a prospective witness, or a family member of the victims is irrelevant. "The relevant question is not whether the community remembered the case, but whether the jurors ... had such fixed opinions that they could not judge impartially the guilt of the defendant." *Patton v. Yount,* 467 U.S. 1025, 1035, 104 S.Ct. 2885, 2891, 81 L.Ed.2d 847, 856 (1984). When questioned, each of the jurors chosen to sit on the case specifically stated that he or she had not formed an opinion as to the guilt or innocence of the defendant. Nothing in the record indicates that their answers were untrustworthy. Indeed, the Delaware Supreme Court found on direct appeal that the trial judge had conducted *voir dire* appropriately and had, in fact, empaneled a fair and impartial jury. *Bailey I*, 490 A.2d at 165–66. As the trial court selected an impartial jury, Bailey's claim for habeas relief on the ground that the trial court erred in denying Bailey's motion for a change of venue necessarily fails.

### 2. *Invalid statutory aggravating circumstance*

Bailey contends that his death sentences must be vacated because the jury at his capital penalty hearing was allowed to consider a constitutionally invalid statutory aggravating circumstance.

11 Del.C. § 4209 provides that a sentence of death shall not be imposed unless the jury or judge, where appropriate, finds:

a. beyond a reasonable doubt at least 1 statutory aggravating circumstance; and

b. unanimously recommends, after weighing all relevant evidence in aggravation or mitigation which bears upon the particular circumstances or details of the commission of the offense and the character and propensities of the offender, that a sentence of death be imposed.

The statute then lists eighteen statutory aggravating circumstances that may be considered by the jury. At Bailey's trial, the State argued it had established the existence of the following four statutory aggravating circumstances:

(1) the murders were committed by one who escaped from a place of confinement;

(2) the murders were committed while the defendant was engaged in flight after committing robbery;

(3) the defendant's course of conduct resulted in the deaths of two people or the deaths were a probable consequence of the defendant's conduct;

(4) the murders were outrageously or wantonly vile, horrible or inhuman.

The jury found beyond a reasonable doubt the existence of all four statutory aggravating circumstances. It then proceeded to weigh all the evidence in aggravation and in mitigation of imposing the death penalty, and unanimously recommended that Bailey be sentenced to death. In response to an interrogatory, the jury reported that in recommending a sentence of death it had relied upon the following two aggravating circumstances: (1) the defendant's course of conduct resulted in the deaths of two people or the deaths were a probable consequence of the defendant's conduct; and, (2) the murders were outrageously or wantonly vile, horrible or inhuman.

On Bailey's appeal from his sentences, the Delaware Supreme Court held that the "outrageously or wantonly vile" statutory aggravating circumstance was unconstitutionally vague. *Bailey II*, 503 A.2d at 1212. The Court went on to hold, however, that based on the United States Supreme Court's opinion in *Zant v. Stephens*, 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983), the submission to the jury of this invalid statutory aggravating circumstance did not require that Bailey's death sentences be vacated.

■ Bailey argues that the Delaware Supreme Court erred in relying on *Zant* and that the decisions in *Cartwright v. Maynard*, 822 F.2d 1477 (10th Cir.1987), *aff'd*, 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988), and *Clemons v. Mississippi*, 494 U.S. 738,

110 S.Ct. 1441, 108 L.Ed.2d 725 (1990) dictate that Bailey receive a new penalty hearing.

For the reasons set forth below, the Court agrees with the Delaware Supreme Court's conclusion that *Zant* controls the resolution of Bailey's claim and that the submission to the jury of an invalid statutory aggravating circumstance does not mandate that Bailey's death sentences be vacated.

In *Zant v. Stephens*, 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983), the United States Supreme Court considered whether a Georgia defendant's death penalty should be vacated because one of the three statutory aggravating circumstances found by the jury was subsequently held to be invalid by the Supreme Court of Georgia. Relying in part on the structure of the Georgia capital sentencing procedure, the Court held that the defendant's death sentence need not be vacated. Because the importance of *Zant* to the resolution of Bailey's claim lies in the similarities between the Delaware and Georgia sentencing statutes, the Court will briefly describe the operation of the Georgia statute.

In Georgia, in order to be eligible for the death penalty, the jury must find beyond a reasonable doubt the existence of at least one out of a total of ten statutory aggravating circumstances. *Zant*, 462 U.S. at 871, 103 S.Ct. at 2739–40, 77 L.Ed.2d at 246. After passing this threshold inquiry, the jury enters the discretionary phase of the procedure where it is to consider all evidence from both the guilt/innocence phase of the trial and the penalty hearing in extenuation, mitigation and aggravation of punishment. *Id.* Statutory aggravating circumstances serve only to narrow the class of offenders eligible for the death penalty. They do not have a specific function in the jury's decision whether a defendant who has been found to be eligible for the death penalty should receive it under all the circumstances of the case. Because statutory aggravating circumstances do not have a specific function in the discretionary phase of the Georgia sentencing procedure, Georgia is referred to as a "nonweighing" state. *See Stringer v. Black*, —— U.S. ——, ——, 112 S.Ct. 1130, 1136–37, 117 L.Ed.2d 367, 378 (1992). In "weighing" states on the other

hand, statutory aggravating circumstances do have a specific function in the discretionary phase of the procedure. In deciding whether to impose a sentence of death, juries are instructed to weigh *only* the statutory aggravating circumstance(s) against any mitigating evidence. *Id.*

The Supreme Court in *Zant* found the death penalty could stand because: (1) the jury had found the existence of two statutory aggravating circumstances in addition to the aggravating circumstance later found to be unconstitutionally vague; and, (2) the jury was allowed to consider at the discretionary phase of the procedure the evidence introduced relating to the invalid statutory aggravating circumstance, and the mere labelling of that evidence as a statutory aggravating circumstance was not unconstitutional given that the trial court did not instruct the jury to place any special weight on the statutory aggravating circumstance. The Supreme Court did not address the application of its holding to a case in which a court in a "weighing" state submitted to a jury an unconstitutional aggravating circumstance: "[W]e do not express any opinion concerning the possible significance of a holding that a particular aggravating circumstance is 'invalid' under a statutory scheme in which the judge or jury is specifically instructed to weigh statutory aggravating and mitigating circumstances in exercising its discretion whether to impose the death penalty." *Zant,* 462 U.S. at 890, 103 S.Ct. at 2749, 77 L.Ed.2d at 258.

In support of his claim, Bailey relies on *Cartwright v. Maynard,* 822 F.2d 1477 (10th Cir.1987), and *Clemons v. Mississippi,* 494 U.S. 738, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990), two cases that addressed the question left open in *Zant, i.e.,* whether jury consideration in a "weighing" state of an invalid statutory aggravating circumstance should necessarily result in a new penalty hearing for the defendant.

For the following reasons, the Court concludes that Delaware is a "nonweighing" state akin to Georgia and, therefore, *Cartwright* and *Clemons* are inapposite. First, the Delaware Supreme Court has noted that the Delaware death penalty scheme "was

obviously fashioned upon the Georgia statute approved by the United States Supreme Court in *Gregg* [*v. State of Georgia,* 428 U.S. 153, 49 L.Ed.2d 859 (1976) ]." *State v. White,* 395 A.2d 1082, 1085 (Del.1978). Second, like the Georgia statute at issue in *Zant,* the Delaware statute requires that before considering a sentence of death, a jury must first find beyond a reasonable doubt the existence of at least one statutory aggravating circumstance. If the jury finds at least one statutory aggravating circumstance, it enters the discretionary phase of the sentencing procedure where it may consider "all relevant evidence in aggravation or mitigation which bears upon the particular circumstances or details of the commission of the offense and the character and propensities of the offender." 11 Del.C. § 4209. The statute does not require that juries be instructed to give any special weight to statutory aggravating circumstances in the discretionary phase of the sentencing determination. Rather, juries may consider "all the particular circumstances of the crime." *Id.*

Having determined that Delaware is a "nonweighing" state, the Court follows the pattern of analysis outlined by the Supreme Court in *Zant* and concludes that inclusion of the "outrageously or wantonly vile" statutory aggravating circumstance does not require that Bailey's sentences be vacated. First, the jury found the existence of three other aggravating circumstances. Thus, without the invalid statutory aggravating circumstance, the jury nevertheless would have passed the threshold stage of the capital penalty inquiry and found Bailey to be a defendant eligible to receive a sentence of death. Second, the trial court did not instruct the jury to place any particular emphasis on the statutory aggravating circumstances in considering whether to impose the death penalty. Although the jury was instructed to answer an interrogatory indicating which statutory aggravating circumstances it relied upon in reaching a verdict of death, the trial court instructed the jury that it was to weigh all relevant evidence in aggravation and in mitigation of death, and did not instruct the jury to place any particular emphasis on statutory aggravating circum-

stances. Third, the evidence considered by the jury under the label of the invalid statutory aggravating circumstance was properly before the jury. That is, the Delaware statute allows the jury to consider "all the particular circumstances of the crime." Thus, even if the jury had not been instructed on the "outrageously or wantonly vile" statutory aggravating circumstance, it could have considered the nature of the murders in reaching its decision to sentence Bailey to death.

### 3. Directing a verdict on a statutory aggravating circumstance

■ In his next claim for relief, Bailey argues the trial court improperly instructed the jury at the capital penalty hearing that it had already found one statutory aggravating circumstance by virtue of its verdict of guilty on two murder charges. Bailey contends this instruction constituted a conclusive presumption and violated his due process rights.

At the conclusion of the penalty hearing, the judge instructed the jury that the State was contending four statutory aggravating factors existed including the following:

> 3. the defendant's course of conduct resulted in the deaths of two persons where the deaths were a probable consequence of the defendant's conduct.

The judge went on to instruct the jury that:

> You have already convicted the defendant of causing the death of two persons; therefore, that aggravating circumstance has been established beyond a reasonable doubt and you are so instructed.

Tr. VII, at 272.

During its deliberations, the jury sent the judge a note indicating it was troubled by the word "probable" in the third statutory aggravating circumstance listed in the charge. In response the judge advised the jury:

> I can just say to you the word can be defined as likely, simply that. It has no technical definition. I also want to remind you that you needn't dwell on that circumstance too much because, as I have told you in the charge, you have already found

that one to exist by virtue of your verdict. . . .

Tr. VII, at 281.

Bailey raised this claim on direct appeal and the Delaware Supreme Court concluded the trial court had properly instructed the jury that the multiple deaths aggravating circumstance had been established by virtue of the jury's verdict of guilty on two charges of murder in the first degree. In its decision, the Delaware Supreme Court noted that:

> The cases cited by defendant relating to the unconstitutionality of conclusive presumptions are inapposite since they apply to trial situations and not after the verdict situations as here in a bifurcated penalty hearing.

Bailey I, 490 A.2d at 173.

In its decision on Bailey's motion for postconviction relief, the Superior Court found that consideration of Bailey's claim was barred because the issue had been resolved against Bailey on direct appeal. Bailey IV, at 28.

Bailey urges this Court to consider the merits of his claim in light of the United States Supreme Court's decision in Arizona v. Rumsey, 467 U.S. 203, 104 S.Ct. 2305, 81 L.Ed.2d 164 (1984). In Rumsey, the Supreme Court held that when a defendant is convicted of a capital crime and "acquitted" as to the death penalty, the Double Jeopardy Clause bars any retrial on the issue of the death penalty. In so holding, the Court noted that a penalty hearing "resemble[s] a trial for purposes of the Double Jeopardy Clause." Id. at 209, 104 S.Ct. at 2309, 81 L.Ed.2d at 170. Bailey contends that because a death penalty hearing is "like a trial," and because conclusive presumptions are unconstitutional in jury trials, the trial court committed reversible error by directing the jury to find the existence of the third statutory aggravating circumstance. See, e.g., Sandstrom v. Montana, 442 U.S. 510, 513, 99 S.Ct. 2450, 2453–54, 61 L.Ed.2d 39, 44 (1979) (conclusive presumption on the issue of intent held unconstitutional).

The State contends Rumsey applies only in the context of the Double Jeopardy Clause

and does not stand for the proposition that a death penalty hearing should be viewed like a trial for purposes of the Sixth Amendment.

The Court agrees that *Rumsey* does not support Bailey's claim. In *Rumsey*, the Supreme Court was careful to analogize trial procedure to capital sentencing procedure only for purposes of the Double Jeopardy Clause. *Rumsey*, 467 U.S. at 210, 104 S.Ct. at 2309–10, 81 L.Ed.2d at 170–71. Additionally, in *Spaziano v. Florida*, 468 U.S. 447, 459, 104 S.Ct. 3154, 3161–62, 82 L.Ed.2d 340, 351 (1984), the United States Supreme Court specifically rejected the inference Bailey seeks to draw: "The fact that a capital sentencing is like a trial in the respects significant to the Double Jeopardy Clause, however, does not mean that it is like a trial in respects significant to the Sixth Amendment's guarantee of a jury trial."

▆▆▆ Furthermore, in support of his argument that conclusive presumptions are unconstitutional in capital sentencing proceedings, Bailey relies exclusively on cases holding conclusive presumptions are unconstitutional in guilt/innocence jury trials. *See, e.g., Connecticut v. Johnson*, 460 U.S. 73, 103 S.Ct. 969, 74 L.Ed.2d 823 (1983); *Sandstrom v. Montana*, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979). These cases are inapposite. The guarantee of a jury trial provides the underpinning for the prohibition against conclusive presumptions. As there is no right to a jury trial in capital sentencing proceedings, *Hildwin v. Florida*, 490 U.S. 638, 640–41, 109 S.Ct. 2055, 2056–57, 104 L.Ed.2d 728, 731–32 (1989), the prohibition against conclusive presumptions is inapplicable to capital sentencing proceedings.

▆▆▆ Assuming *arguendo* that the trial court erred in directing the jury to find the existence of the third aggravating circumstance, that error was harmless in the context of this case. Bailey's jury found the existence of three other statutory aggravating circumstances. As the existence of only one statutory aggravating circumstance is sufficient to pass the threshold stage of the capital penalty determination, 11 Del.C. § 4209(d)(1)(a), the jury would have reached the discretionary phase of the penalty determination regardless of its finding as to the existence of the multiple deaths aggravating circumstance.

### 4. Cruel and unusual punishment

In his petition, Bailey claimed that death by hanging or by lethal injection as performed in Delaware would violate Bailey's Eighth Amendment right to be free from cruel and unusual punishment.

Bailey presented this claim to the Superior Court in his motion for postconviction relief. In support of the claim, Bailey submitted affidavits from a medical doctor and a history professor in support of his contention that executions by hanging and lethal injection can result in lingering death and unnecessary pain and suffering. Bailey also argued that the lack of experienced medical personnel participating in Delaware's procedures increased the likelihood that a particular defendant might die a lingering death. Based on this evidence, Bailey requested the Superior Court to conduct an evidentiary hearing on the issue of whether death by hanging or lethal injection as applied in Delaware violated Bailey's Eighth Amendment rights. The Superior Court denied Bailey's request for an evidentiary hearing and found Bailey had not established that the Delaware Department of Corrections would not carry out Bailey's execution in conformance with the Eighth Amendment.

In this proceeding, Bailey again requested an evidentiary hearing on his Eighth Amendment claim. At oral argument on March 3, 1993, the Court noted that Delaware had executed a convicted defendant by lethal injection in March of 1992 (Steven Pennell) and that it was scheduled to execute another defendant by lethal injection later in March of 1993 (James Allen Red Dog). Therefore, in response to Bailey's request for an evidentiary hearing and to aid the Court in addressing the merits of Bailey's challenge to death by lethal injection, the Court ordered the State to serve and file an affidavit identifying the procedures implemented in Delaware for conducting executions by lethal injection and delineating how those procedures had worked in the Pennell and Red Dog executions.

On April 19, 1993, in response to the Court's Order, the State submitted an affidavit from Henry Risley, the Bureau Chief for the Bureau of Prisons for the Delaware Department of Correction. In his affidavit, Mr. Risley averred that the procedure for execution by lethal injection in Delaware was modeled on the system used in Texas, a state with significant experience in performing executions by lethal injection. Mr. Risley also averred that he was a witness to the executions of Steven Pennell and James Allen Red Dog and that in neither execution did he notice any sign that the prisoner experienced unnecessary pain or suffered a lingering death.

██ Having reviewed the affidavit submitted by the State, Bailey withdrew his Eighth Amendment challenge to executions as performed in Delaware. *See* D.I. 37. The State subsequently filed a memorandum in opposition to Bailey's voluntary dismissal of the Eighth Amendment claim. *See* D.I. 38. In its memorandum, the State argues that Bailey should not be permitted to withdraw his claim after forcing the State to spend considerable time and energy defending the claim and after realizing that defeat on the claim is "certain and imminent."

Although the Court is mindful of the effort expended by the State in responding to Bailey's claim, the Court concludes that it would be inappropriate to consider the merits of Bailey's Eighth Amendment challenge to executions in Delaware as Bailey has withdrawn from the adversarial process with regard to this claim. Accordingly, the Court need not address the merits of Bailey's final claim.

For the foregoing reasons, the Court will deny Bailey's petition for a writ of habeas corpus. The Court will enter an Order in accordance with this Opinion.